

**ORDERED in the Southern District of Florida on June 25, 2018.**

Raymond B. Ray, Judge
United States Bankruptcy Court

_____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov
Fort Lauderdale Division

In re:

GLOBAL ENERGIES, LLC,                                    Case No. 10-28935-RBR

      Debtor.                                                      Chapter 7

_____/

**FINAL ORDER ON REMAND**

THIS MATTER came before the Court for an eleven-day trial, which concluded on October 26, 2017,[1] upon the remaining counts in Mr. Joseph G. Wortley's Complaint [D.E. 1, Adv. Proc.], Defendants' affirmative defenses to the Complaint, and the Motion to Dismiss Case for Bad Faith Based on New and Additional Evidence of Conspiracy and Misrepresentations [D.E. 128, Main] (the "Second Motion to Dismiss"), and the Mandate of the United States Court of Appeals for the Eleventh Circuit (the "Eleventh Circuit"). The Court entered this Final Order on Remand to resolve the disputes raised in the Mandate.[2]

---

[1] The trial dates occurred on July 11, 12, 13, and 14, 2017; August 15, 16, and 23, 2017; September 5, 2017; and October 10, 11, and 26, 2017. The dates were nonconsecutive to accommodate the parties' and Court's schedules.

[2] The Court entered a duplicate of this opinion in both the main bankruptcy case and the adversary proceeding because the issues of law and factual findings relating to the Eleventh Circuit's Mandate, Complaint [D.E. 1, Adv. Proc.], and Second Motion to Dismiss [D.E. 128, Main] are intertwined in a manner that made any attempt at separation futile.

## I. FINDINGS OF FACT

During the eleven-day trial, the Court admitted over 200 exhibits into evidence, heard argument from the parties, and heard testimony from four witnesses for the Plaintiff's case in chief, nine witnesses for the Defendants' case in chief, and three rebuttal witnesses for the Plaintiff. [D.E. 1, 455, 456, 457, 458, Adv. Proc.; D.E. 128, Main].[3] This matter was tried on the facts without a jury or an advisory jury; thus, the Court found the following facts specially and states its conclusions of law separately, and judgment shall be entered forthwith. Fed. R. Civ. P. 52(a), 58.[4]

**A. Mr. Wortley's Animosity Towards Mr. Tarrant and Mr. Juranitch Formed the Basis of the Case.**

The crux of this case is a garden-variety business divorce between the owners of Global Energies, a privately held corporation. The owners – Mr. Wortley, Mr. Juranitch, and Mr. Tarrant – were friends before the founding of Global Energies. In 2008 and 2009, Mr. Wortley brought Mr. Tarrant and Mr. Juranitch together as business partners to form Global Energies; Mr. Wortley's friendships with both men became the foundation for the business. Trial Tr. Vol. III, 524-25. Mr. Wortley and Mr. Juranitch were "very good friends" and confidants, and Mr. Wortley even introduced Mr. Juranitch to his wife. Trial Tr. Vol. III, 516. Mr. Wortley and Mr. Tarrant met through their participation in local social clubs where they became close friends who played golf together. Trial Tr. Vol. III, 524, 727-28, 603-04, 606. After the separation of the owners, Mr. Wortley friendships with Mr. Tarrant and Mr. Juranitch ended, and Mr. Tarrant and Mr. Juranitch formed a second company without him. The central figure in this case is Mr. Wortley, and it is the opinion of the Court that Mr. Wortley's personal animosity and rancor towards Mr. Juranitch and Mr. Tarrant has fueled this case far beyond the rational stopping point of a traditional bankruptcy case. *See* discussion *infra* Section I.U.1.

**B. Mr. Wortley and Mr. Juranitch Formed Global Energies, and Mr. Wortley Invited Mr. Tarrant and Chrispus to Invest as a Member of Global Energies.**

---

[3] On the record during Mr. Wortley's rebuttal case, Mr. Wortley waived the attorney-client privilege. Trial Tr. Vol. IX, 2042.
[4] Fed. R. Civ. P. 52(a) and 58 are made applicable to these proceedings through Fed. R. Bankr. P. 7052 and 7058.

On July 14, 2008, Mr. Wortley and Mr. Juranitch went into business together and formed Global Energies. Exs. D2-A; P-1.[5] Mr. Wortley and Mr. Juranitch were Members of Global Energies with Mr. Wortley owning 23% and Mr. Juranitch owning 77% of Global Energies. *Id.* Mr. Wortley contributed $23,000.00 in initial capital, and Mr. Juranitch contributed his "intellectual property rights of the Invention entitled 'Recycling and reburning Carbon Dioxide in an energy efficient way'" and his "research and development work and intellectual property rights in and ownership to the work that has been done in the field of Production of Biofuels and/or Capturing Carbon Dioxide (CO2) from the atmosphere or production facilities." *Id.* at Section 2.1a. Mr. Wortley "was the business guy, responsible for business and bringing in money," and Mr. Juranitch "was [the] technical guy, responsible for bringing in technology and making it work." Trial Tr. Vol. III, 506-08; Vol. VI, 1252; Vol. IX, 1922 ("Joe [Wortley], you were business, I [Mr. Juranitch] was technical.").

After the initial formation, Mr. Wortley and Mr. Juranitch increased their respective contributions. Mr. Juranitch signed a Consulting Agreement pledging his consulting services on a "full-time, exclusive basis" in the areas of biofuels and CO2 Sequestration (i.e. Global Energies' specific areas of technology) in exchange for $100,000 per year. Trial Tr. Vol. VI, 1317; Ex. D2-B. The parties expected the Consulting Agreement to remain in effect from September 1, 2008 through April 13, 2011. *Id.* On April 17, 2009, Mr. Wortley executed the Master Promissory Note ("Mr. Wortley's Note") and Master Security Agreement, in which Mr. Wortley agreed to loan Global Energies $200,000 with 8% interest in exchange for a security interest in Global Energies's accounts and "all worldwide right, title and interest in or to all Intellectual Property related to Patents Issued, Pending and/or Filed in the future, owned in whole or in part by Debtor." Exs. P-4; P-5.

In May of 2009, Mr. Tarrant invested in Global Energies at Mr. Wortley's invitation. On May 29, 2009, the parties signed the Amended Restated Operating Agreement (the "Agreement"), which gave Mr.

---

[5] Organizational system for the exhibits: "P" represents Mr. Wortley; "D1" represents Mr. Tarrant and Chrispus Venture Capital, LLC; "D2" represents Mr. Pugatch and the Law Firm, Rice Pugatch Robinson Schiller, PA; and "D3" represents Mr. Juranitch.

Tarrant's corporation,[6] Chrispus Venture Capital, LLC ("Chrispus"), a 5% ownership interest in exchange for a $25,000 cash investment. Exs. D1-D; D2-H; P-7; Trial Tr. Vol. IX, 1952-53. Under the Agreement, Mr. Wortley owned 32%; Mr. Juranitch owned 63%; and Chrispus owned 5% of Global Energies. Exs. D1-D; D2-H; P-7 at Exhibit A. On May 29, 2009, Chrispus loaned Global Energies one million dollars at a 6% interest rate, which Chrispus invested in Global Energies in ten monthly installments of $100,000.00.[7] Trial Tr. Vol. IX, 1953; Exs. D2-J; P-6. Mr. Tarrant received the title of "Vice Chairman;" however, although this title afforded Mr. Tarrant credibility with potential customers, Mr. Tarrant had no decision-making authority, and he was not a "managing member or manager." Trial Tr. Vol. IX, 1954-55; Vol. X, 2321 (Mr. Tarrant testified that he "had no authority. I had 5 percent – I had no authority. Only you [Mr. Wortley] and Jim [Juranitch] together.").

Under the Agreement, Mr. Wortley and Mr. Juranitch (as the Board of Managers) managed the operations of Global Energies, and "any matter within the authority of the managers shall be decided by the majority vote of the Board." Exs. D1-D; D2-H; P-7 at Section 5.1. Consensus between Mr. Juranitch and Mr. Wortley was required to "contract with any persons or entities for the transaction of the business of the Company." *Id.* at Section 5.4. If a deadlock occurred between Mr. Juranitch and Mr. Wortley, the Members needed a 75% majority vote of the Members to remove a Manager or elect new Managers. *Id.* at Section 5.2 and Definitions. A 75% majority vote of the Members was needed to cause Global Energies to enter into a sale, liquidate, dissolve, or wind-up. *Id.* at Section 5.5. Dissolution of Global Energies could only be triggered automatically by 1) a sale of substantially all assets, 2) a 75% majority vote, or 3) if dissolution were otherwise provided by law. *Id.* at Section 8.1. Neither Chrispus nor Mr. Tarrant held an office, managerial role, or other significant role in Global Energies. *Id.*; Trial Tr. Vol. IX, 1960. Thus, Mr. Wortley's cooperation and 30% share of Global Energies were required to solve a deadlock between the

---

[6] Mr. Tarrant owned 93% of Chrispus, and Mr. Ron Roberts owned 7%. Trial Tr. Vol. IX 1951-52. "Ron Roberts is my [Mr. Tarrant's] financial advisor and partner." Trial Tr. Vol. IX, 1952. The partners used Chrispus as an "investment vehicle for new companies and opportunities." Trial Tr. Vol. IX, 1951-52. Mr. Tarrant and Mr. Roberts both acted on behalf of Chrispus either unilaterally or jointly throughout this case.
[7] Interest payments were due yearly on May 29th. Exs. D2-J; P-6.

Managers – Mr. Wortley and Mr. Juranitch. Trial Tr. Vol. III, 527; V, 1025, 1028 (Mr. Wortley testified: "for either of, Mr. Wortley or for Mr. Juranitch to do anything significantly, such as filing a bankruptcy, . . . would require the consent of both of us."). Mr. Juranitch and Chrispus' combined 70% of Global Energies' shares was insufficient to break a deadlock, under the requirements of the Agreement.

**C. The Members Recognized the Potential for Increased Value, but the Value was Never Realized.**

Between May 2009 and May 2010, Global Energies entered an exciting period with multiple potentially lucrative projects. Exs. P-61 (Mr. Juranitch explained that "Plasmawool revenues could be high"); P-62 (Mr. Juranitch described Plasmawool as a "high value/profit product"); P-63 (Mr. Juranitch described proposed projects in North Carolina and Iowa to turn waste into energy); P-65 (describing plans for a proposal to open "3 plants at around 750 million" and new markets "we never thought of"); P-69 (regarding the Iowa Deal "[t]here is no contract but prospects are very good"); P-8 (Mr. Juranitch informed the other parties of his estimations for profit by stating "the numbers are staggering and we are not yet attacking our most lucrative markets").

Mr. Juranitch created Global Energies' products and managed Global Energies' day-to-day operations, while Mr. Wortley and Mr. Tarrant financed Global Energies' operations. *Id.* During the summer of 2009, Mr. Wortley and Mr. Tarrant discussed financing options for Global Energies; Mr. Wortley introduced Mr. Tarrant to Mr. Michael McCarty during a game of golf where Mr. McCarty pitched the idea of a possible merger with another company – Synthesis Energies Systems (SES). Trial Tr. IX, 1957-58; Exs. D1-D2; P-99. Mr. Tarrant rejected a merger with SES in an email to Mr. Wortley. *Id.* Mr. Tarrant thought SES was "a trainwreck that would consume [Global Energies] if we owned/ran," and he believed they "produce[d] very dirty energy and we [Global Energies] could be labelled as bad guys." *Id.* Mr. Tarrant's testimony at trial on multiple days was consistent with the email sent to Mr. Wortley.[8] *Id.* Ultimately, even Mr. Wortley admitted that SES was a "disaster." Trial Tr. Vol. IV, 763-64.

---

[8] Mr. Tarrant testified that SES was a "trainwreck," and he rejected the merger with SES because he "determined that it was dirty energy that they [SES] were producing, and even if that was a good business from a profit and loss standpoint, I knew it would kill our business trying to sell clean energy, if we got this other company that's doing the dirty stuff in China." Trial Tr. Vol. IX, 1958-60. On cross-examination by Mr. Wortley, Mr. Tarrant again testified

Although Mr. Wortley, Mr. Tarrant, and Mr. Juranitch believed Global Energies to be a valuable investment, Global Energies had no concrete value on paper. Global Energies never legally owned any patents.[9] Global Energies had no revenue in 2008, 2009, or 2010, and Global Energies had a negative cash flow at all times leading up to May 13, 2010. Trial Tr. Vol. V, 1015-16. Global Energies never had a signed contract nor a single customer. Trial Tr. Vol. III, 664; Vol. V, 1028. Mr. Wortley admitted that Global Energies needed a cash infusion because Global Energies had no cash in its bank accounts.[10] Trial Tr. Vol. III, 741, 811-12. By the end of April 2010, Global Energies had used all of the loan proceeds from Chrispus and could not pay its bills or Mr. Juranitch's salary.[11] Trial Tr. Vol. V, 1029; Vol. IX, 1960; Vol. X 2335. Global Energies had used approximately $50,000.00 of Mr. Juranitch's own money to pay bills and employees prior to the breakup of the company.[12] Trial Tr. Vol. IX, 1899-900. Mr. Wortley acknowledged that Global Energies had access to "sources of capital" and could potentially obtain financing through Mr. McCarty, Deutsche Bank,[13] Mr. Wortley and Mr. Tarrant; however, the only realistic sources of funding were Mr. Wortley and Mr. Tarrant. Trial Tr. Vol. III, 741, 811-12; Vol. IV, 811-12; Vol. V, 1030.

Despite the unrealized value of Global Energies, both Mr. Wortley and Mr. Tarrant became enamored with increasing their ownership interests in Global Energies and sought to renegotiate the

---

consistently that he refused to agree that SES would have benefitted Global Energies, even if they had $90 million in cash. Trial Tr. Vol. X, 2214-17 (Mr. Tarrant referred to SES as a "walk," and noted that "it didn't make any difference" because SES used dirty power and that association would have damaged Global Energies' business.).

[9] Mr. Wortley believed that Global Energies owned patents, but he failed to adequately research the status of Global Energies' patents. Trial Tr. Vol. VI, 1187 ("As far as patents or so forth, I know what I believed they [Global Energies] owned, and I have not sat and looked at a - - the document that Mr. Mukamal [the trustee] had for assets that he had received.").

[10] Mr. Wortley gave inconsistent testimony to the Court on whether Global Energies had cash. Mr. Wortley refused to admit that Global Energies did not have cash in its accounts, and he incorrectly tried to equate having cash to having access to capital on multiple occasions. Trial Tr. Vol. V, 1044, 1113-1114; Vol. VI, 1189, 1191. Additionally, Mr. Wortley refused to testify as to whether Global Energies had cash. Mr. Wortley was asked, "it was out of cash prior to May 17?", and Mr. Wortley responded: "I don't know. I can't testify to that." *Id.* Shortly thereafter, Mr. Wortley agreed that he could testify to whether Global Energies had cash. *Id.*

[11] Mr. Tarrant and Mr. Juranitch believed that Mr. Juranitch was no longer bound by the Consulting Agreement because Global Energies could no longer pay him, and the consideration had evaporated. Trial Tr. Vol. X, 2335; Vol. IX, 1896, 1926. Mr. Juranitch was last paid by Global Energies on May 8, 2010. Trial Tr. Vol. IX, 1926. The Court refrained from opining on the validity of the Consulting Agreement because the validity of that document is an issue for the state court, and the validity of the Consulting Agreement had no effect on this Court's instant decision.

[12] Mr. Tarrant reimbursed Mr. Juranitch for the $50,000.00 as a private person, not from the proceeds of the company or Mr. Wortley. Trial Tr. Vol. IX, 1901-02.

[13] Mr. Wortley testified that the parties never attended the meeting with Deutsche Bank, which caused this Court to find that Deutsche Bank was an inviable source of funding. Trial Tr. Vol. III, 621; Vol. V, 1032; Vol. VI, 1180.

division of equity.  On March 4, 2010, Mr. Ron Roberts (Mr. Tarrant's "financial advisor and partner") first suggested to Mr. Tarrant that Chrispus acquire an additional 5% for $28,396.62 in light of the potential deals with North Carolina and Wisconsin. Ex. P-66; Trial Tr. Vol IX, 1952. After discussing the idea of using the potential Iowa deal to trigger the "contingency paragraph in [the] purchase agreement" to purchase additional shares, Mr. Roberts informed Mr. Tarrant on May 10, 2010 that he would "try to acquire up to a total of 10% on behalf of Chrispus." Exs. P-69; P-70. That same day, Mr. Tarrant suggested using the handwritten option agreement to purchase additional 10% in the negotiations. Ex. P-71. Finally, Mr. Tarrant executed a handwritten contract expressing intent to "exercise my option to purchase 67,611 shares of Global Energies [at] $.42 per share for a total purchase price of $28,396.62." Trial. Tr. Vol. X, 2334; Exs. D2-O; P-11. This handwritten contract never became effective due to the intervening events that followed.[14] *See* discussion *infra* Sections I.D, I.E.

**D. Global Energies' Members Experienced a Breakup Causing the Death of Global Energies.**

According to Mr. Juranitch's testimony, on May 12, 2010, Mr. Wortley was upset about not receiving enough information regarding Global Energies from Mr. Juranitch; however, Mr. Juranitch had provided Mr. Wortley with periodic, monthly reports, including a report on April 2, 2010, and Mr. Wortley received the same information as everyone else involved in Global Energies' business. Trial Tr. Vol. VI, 1308; Ex. P-63. At the May 12, 2010 meeting, Mr. Wortley presented Mr. Juranitch with a proposed contract for Mr. Wortley to purchase 270,000 shares from Mr. Juranitch for "$10 and other valuable consideration." Trial Tr. Vol. VI, 1265; Ex. D3-P21. If signed, the proposed contract would give Mr. Wortley a "controlling interest" in Global Energies. *Id.* Mr. Juranitch credibly and consistently testified regarding how Mr. Wortley commanded Mr. Juranitch to sign the proposed contract "immediately," without consulting an attorney. Trial Tr. Vol. VI, 1266, 1392. If Mr. Juranitch refused to sign, then Mr. Wortley threatened Mr. Juranitch with "dire consequences" because Mr. Wortley would "cut off all credit cards, all

---

[14] Mr. Tarrant intended to invest the second one million dollars in Global Energies when he signed the document on May 10, 2010; however, Mr. Tarrant never released the second one million dollar investment, as promised on May 10, 2010, because of an adverse material change: Mr. Wortley "[blew] up the company." Trial Tr. Vol. X, 2211-12, 2331-32.

insurance, all payroll," and the "company wouldn't be funded." Trial Tr. Vol. VI, 1266, 1268. Mr. Juranitch testified that Mr. Wortley threatened the same "dire consequences" in the event that Mr. Juranitch discussed the proposed contract with Mr. Tarrant. Trial Tr. Vol. VI, 1268. Mr. Juranitch refused to sign the proposed contract because he required time to consider the contract and contact an attorney. *Id.*

The following day on May 13, 2010 around 9:30 A.M., Mr. Wortley arrived at Global Energies' facilities, removed Mr. Juranitch from a business meeting, and "insisted [Mr. Juranitch] sign [the proposed contract] and give him controlling interest." Trial Tr. Vol. VI, 1269. Mr. Wortley reiterated his threat to shut off company funding and credit cards. *Id.* Mr. Wortley stressed that signing the proposed contract was more important than any other company project, including the potential deal in Iowa. *Id.* Mr. Juranitch responded by reiterating that he wanted to consult an attorney before signing, and Mr. Wortley again insisted that he sign immediately without consulting counsel. *Id.* When Mr. Juranitch refused to sign and walked away, Mr. Wortley followed Mr. Juranitch "screaming that he was turning off all credit cards, . . . and shutting down the company funding." Trial Tr. Vol. VI, 1270, 1363. Mr. Juranitch testified that he "had no reason to doubt" that Mr. Wortley intended to cut the credit cards off. Trial Tr. Vol. VI, 1363. Without the credit cards, Mr. Juranitch could not "go to a plasma conference . . . that happened once every two years," and he could not interview and entertain a "key guy for interviews" who was scheduled to arrive later that evening. *Id.* According to Mr. Juranitch, both the plasma conference and interview were "key to our [Global Energies'] success." *Id.*

After Mr. Wortley's reaction, Mr. Juranitch believed Mr. Wortley was "melting down," and Mr. Juranitch began to worry about Global Energies and its employees. *Id.* In a moment of prescience, Mr. Juranitch recalled how Mr. Wortley had previously bragged to him about "trying to force his will on another company he was involved in, and he had locked out all the employees." Trial Tr. Vol. VI, 1271. Mr. Juranitch believed that Mr. Wortley would repeat this behavior and lock him and the employees out of the facility. *Id.* This greatly concerned Mr. Juranitch because he kept a large amount of personal property at the facility – enough to fill "a 4800 square foot warehouse," including items he inherited from his recently deceased father. Trial Tr. Vol. VI, 1271-72.

On that same day, Mr. Juranitch decided to inform the employees "that something was desperately wrong," and "[t]hey needed to get their personal stuff out." Trial. Tr. Vol. VI, 1272. Additionally, Mr. Juranitch requested their help in removing his own personal items. *Id.* Later that evening, Mr. Juranitch and the employees removed his personal items (i.e. approximately 99% of the items removed) and a small amount of company property (i.e. approximately 1%) from the facility. Mr. Juranitch, with the assistance of other employees, removed *de minimis* items including "plasma torch heads," "two analyzers," and "a printer thrown in by mistake." Trial Tr. Vol. VI, 1273, 1275. Mr. Juranitch decided to remove the plasma torch heads because the plasma torch heads "had less than a week of life," until the parts corroded. Trial Tr. Vol. VI, 1274. If the plasma torch heads were not properly serviced, then they "would go to catastrophic failure, [and] it would destroy the equipment and potentially hurt all the employees." *Id.* Mr. Juranitch turned over all of Global Energies' property to the Chapter 11 Trustee, Mr. Mukamal, during the course of the bankruptcy.[15] Trial Tr. Vol. VI, 1273; *see* discussion *infra* Section I.M.

When Mr. Juranitch returned to give Mr. Wortley the keys to the building, Mr. Juranitch discovered that "[t]he doors were locked, [and his] keys didn't work." Trial Tr. Vol. VI, 1275. Mr. Juranitch testified that, after this experience, he would never work with Mr. Wortley again. Trial Tr. Vol. VI, 1276. In response to Mr. Wortley's question concerning whether Mr. Juranitch could continue working for Global Energies, Mr. Juranitch explained that he could not continue because "there was no insurance; the credit cards were cut off; . . . there was no payroll; [and he] was locked out of the building." Trial Tr. Vol. VI, 1393. Prior to this time, Mr. Juranitch testified that he would never have considered walking out. Trial Tr. Vol. VI, 1275.

**E. Mr. Wortley's Version of the Breakup Events Failed to Rebut Mr. Juranitch's Account**

Mr. Wortley's depiction of these events generally comported with Mr. Juranitch's account; however, Mr. Wortley's depiction painted himself in a more favorable light. Mr. Wortley testified that he usually follows an "80/20" rule, where he, as the investor, receives 80% of the company, and the inventor receives 20% of the company. Trial Tr. Vol. V, 1031. However, Mr. Wortley deviated from his "80/20"

---

[15] The bankruptcy case was filed on July 1, 2010. [D.E. 1, Main].

rule and signed an operating agreement giving himself 23% and Mr. Juranitch 77% of the company. Trial Tr. Vol. III, 509; Vol. V, 1031. Mr. Wortley deviated from his "80/20" rule because he found that "Mr. Juranitch's presentation to me [Mr. Wortley] in '08 was so good," and Mr. Wortley believed Mr. Juranitch was close to sealing a deal in Wisconsin.[16] *Id.* Mr. Wortley explained that Mr. Juranitch was "an integral part of the company," "a very important piece of the puzzle," and "the technologies that Mr. Juranitch brought to the party were [sic] the main thrusts of Global Energies." Trial Tr. Vol. V, 1014; Vol. VI, 1150-51. Without Mr. Juranitch, Mr. Wortley testified that "[i]t would have been difficult" for Global Energies to survive.[17] Trial Tr. Vol. V, 1014. Ultimately, the Wisconsin deal never came to fruition, and Mr. Juranitch began to pursue opportunities in Iowa on behalf of Global Energies. Trial Tr. Vol. VI, 1178.

During this time, Mr. Wortley became upset with Mr. Juranitch. Trial Tr. Vol. V, 1031-32; Vol. VI, 1178. First, Mr. Wortley testified that he did not understand why the "Iowa [deal] was on the front burner, and Wisconsin [deal] was gone" because he was uninformed on the progress happening. Trial Tr. Vol. III, 543, 658, 661-62; Vol. VI, 1178. Mr. Wortley wanted an explanation from Mr. Juranitch. Trial Tr. Vol. III, 543. Second, Mr. Wortley was upset with Mr. Juranitch because he felt that the ownership distribution needed to be changed. Trial Tr. Vol. III, 545; Vol. V, 1033-34. Mr. Wortley "felt that Mr. Tarrant was entitled to more [and] . . . Mr. Juranitch was entitled to less." *Id.* (Mr. Wortley thought that the initial distribution was unfair because it was "based on something [the failed Wisconsin Deal] that turned out not to be true."). Third, Mr. Wortley was upset with Mr. Juranitch because Mr. Juranitch either would not or could not make time in his schedule to meet with Deutsche Bank and pitch Global Energies' technology to them. Trial Tr. Vol. III, 621. Mr. Juranitch testified that he did not refuse the Deutsche Meeting, and Mr. Wortley cancelled the Deutsche Meeting, not him. Trial Tr. Vol. VI, 1307. Regardless, Global Energies' financial situation exacerbated the tension between Mr. Juranitch and Mr. Wortley. *See* discussion *supra* Section I.C.

---

[16] Once the parties signed the Operating Agreement, this ownership split was modified, but Mr. Juranitch still received the lion's share of the company. *See* discussion *supra* Section I.B.

[17] Mr. Wortley testified that he "didn't have the skills" that Mr. Juranitch possessed, and he could "only think of one person" who could fit Mr. Juranitch's role with Global Energies. Trial Tr. Vol V, 1014.

Mr. Wortley asked Mr. Juranitch to meet on May 12, 2010. According to Mr. Wortley, the purpose of the May 12th meeting was to discuss the Iowa deal and the ownership distribution (including Mr. Tarrant's desire for a larger percentage and Mr. Juranitch's failure to finalize the deal in Wisconsin). Trial Tr. Vol. III, 545-46, 621-22. At the May 12th meeting, Mr. Wortley asked Mr. Juranitch for an explanation and information, and Mr. Juranitch explained that he could not discuss it because he was busy working on Global Energies' projects. Trial Tr. Vol. III, 741. Mr. Wortley, knowing that Global Energies needed a cash infusion, made a demand or proposal that Mr. Juranitch sign over "a significant portion of his equity . . . until certain conditions were met."[18] Trial Tr. Vol. V, 1031. If Juranitch had signed over the shares, Mr. Wortley would have had a controlling interest in Global Energies; however, Mr. Juranitch refused. Effectively, Mr. Wortley had presented Mr. Juranitch with an ultimatum: sign over a significant portion of your equity in exchange for continued financing, or "tell me what the heck is going on."[19] Trial Tr. Vol. VI, 1178-79; Vol. V, 1053 ("I needed to find out, as a managing member, what the heck happened."). Mr. Wortley disingenuously argued that he did not demand a 51% interest in Global Energies; rather, Mr. Wortley claimed he used the demand merely as a "negotiating tactic." Trial Tr. Vol. VI, 1392. After being presented with the demand and ultimatum, Mr. Wortley alleged that Mr. Juranitch "stormed out" and "said I'll come back and I'll see you on Monday the 17th and we'll talk about it." Trial. Tr. Vol. III, 546.

The next morning on May 13, 2010, Mr. Wortley "felt that [he] had to get a further understanding with Mr. Juranitch," so he visited Mr. Juranitch at the Deerfield office. Trial Tr. Vol. III, 546. Mr. Wortley described Mr. Juranitch as "belligerent" during the May 13th meeting. *Id.* Mr. Wortley testified that, at that time, he told Mr. Juranitch, "Don't spend any money until you tell me what's happening." Trial Tr. Vol. III, 548. When Mr. Wortley visited the Deerfield Office on May 14, 2010, he discovered that the "stuff was gone." Trial Tr. Vol. III, 549. Mr. Wortley stated: "Mr. Juranitch . . . was off the reservation, he had taken

---

[18] Mr. Wortley initially stated that he had asked Mr. Juranitch to place the shares "in escrow;" however, he admitted on cross examination that Mr. Wortley had asked Mr. Juranitch to sign the shares over to him with the option to purchase them back for a nominal sum, if his conditions were met. Trial Tr. Vol. V, 1031, 1057.
[19] Mr. Wortley admitted no other documents exist that propose that Mr. Juranitch transfer equity to any party other than Mr. Wortley. Trial Tr. Vol. VI, 1185.

a lot of Global assets from the building and taken to parts unknown, and taken all of the employees to parts

unknown, and I wanted him to come back." Trial Tr. Vol. III, 556, 622; Vol. V, 1038 (Mr. Wortley stated

that five employees left with Mr. Juranitch). Mr. Wortley explained that his phrase – "off the reservation"

– meant that Mr. Juranitch refused to talk to him multiple times and refused to meet on May 17, 2010. Trial

Tr. Vol. V, 1041. Mr. Wortley believed that Mr. Juranitch had a fiduciary duty to "come and talk" with

him. Trial Tr. Vol. V, 1071. Thus, Mr. Wortley directed Mr. Sweetapple, one of his employees, to write a

letter to Mr. Juranitch requesting that he come back. Trial Tr. Vol. III, 573. After discovering that Mr.

Juranitch had moved out of the Deerfield Office, Mr. Wortley believed that Mr. Juranitch and Mr. Tarrant

had "[taken] all of the company on the evening of May" 12th, so Mr. Wortley changed the locks at the

Deerfield Office and cut off the company credit cards, "until Mr. Juranitch came back to the table."[20] Trial

Tr. Vol. III, 594; Vol. IV, 813-14; Vol. V, 1036-37, 1094. However, as a result of these events, Mr. Juranitch

refused to work with Mr. Wortley anymore, and Mr. Wortley failed to reinstate these measures, even when

"Mr. Juranitch came back to the table" during negotiations. Trial Tr. Vol. V, 1042; *see* discussion *infra*

Section I.G.

Mr. Wortley believed that Global Energies was not closed and out of business, and he testified that

he thought Global Energies was still operating as of May or June 2010. Trial Tr. Vol. III, 573, 587; Vol.

IV, 734; Vol. V, 1046-47. Mr. Wortley believed that Mr. Tarrant "took Jim's [Juranitch] side," and that

they were operating Global Energies together from afar. Trial Tr. Vol. IV, 743. Mr. Wortley believed Global

Energies to be operating because there was another presentation given in Iowa. Trial Tr. Vol. III, 587; *see*

discussion *infra* Section I.F. Mr. Wortley stated, "Global [Energies] was in Mr. Juranitch's and Mr.

Tarrant's minds, still operating, although they were trying to also operate Plasma Power." *Id.* However, Mr.

Wortley admitted that he had no personal knowledge of whether Global Energies was still operating after

May 12, 2010, and Mr. Wortley failed to produce any evidence to support his beliefs that Defendants

continued to operate Global Energies. *Id.*

---

[20] Mr. Wortley gave inconsistent testimony on whether he cut off the company credit cards; however, he ultimately
admitted that he did, in fact, cut off the company credit cards. Trial Tr. Vol. VI, 1179, 1181.

Mr. Wortley admitted that Global Energies was deadlocked at this time because Mr. Juranitch and Mr. Wortley were in a dispute. Trial Tr. Vol. VI, 1207-08. Mr. Wortley admitted that Global Energies needed to be reconstituted; however, Mr. Wortley also admitted there was "probably not" a way to reconstitute Global Energies because Mr. Juranitch refused to work with Mr. Wortley again. Trial Tr. Vol. VI, 1164, 1175.  The Court refused to afford any weight to Mr. Wortley's depiction of the events, to the extent they diverged from Mr. Juranitch's account, because the Court found that Mr. Wortley's testimony lacked credibility. *See* discussion *supra* Section I.U.1.

**F. Mr. Tarrant Managed the Fall Out After the Breakup Between Mr. Wortley and Mr. Juranitch.**

During the breakup between Mr. Wortley and Mr. Juranitch, Mr. Tarrant was out of the country in France. Trial Tr. Vol. IX, 1943, 1960-61. On May 14, 2010, while Mr. Tarrant was in France, Mr. Wortley emailed Mr. Tarrant first to report that he had "turned off the $ to Jim [Juranitch] until issues resolved- he may try to run to you in order that he can seek approval of his foolish ways . . . please let me know if he crys to you."[21] Ex. D1-V7; Trial Tr. Vol. IX, 1973-74 (Mr. Tarrant testified that he believed that Mr. Wortley had ceased providing funding to Global Energies upon his receipt of this email). On May 15, 2010, Mr. Juranitch emailed Mr. Tarrant second to report, "Joe [Wortley] has gone through a major melt down that has put your investment at great risk." Ex. D1-N5.[22]

On May 17, 2010, Mr. Wortley emailed Mr. Tarrant multiple times to set up a meeting time and stated that Mr. Juranitch had "absconded with [Global Energies'] assets to parts unknown" and that Mr. Juranitch was "so far off the reservation." Exs. D1-E; D1-G; *see supra* p. 12. On that same day, Mr. Juranitch told Mr. Tarrant that "all Hell [had] broken loose," but he was still "[w]orking flat out on Iowa . . . to make up significant ground." Ex. P-17 (full email); P-73 (page one only).  During this time, Mr. Juranitch attempted to keep Global Energies afloat and maintain progress on the ongoing projects. Exs. P-

---

[21] Mr. Wortley stated that he had received an email from Mr. Tarrant telling him to "be cool" almost immediately after the May 12 meeting with Mr. Juranitch. Mr. Tarrant explained that this "be cool" email was unrelated to the breakup events because Mr. Tarrant "had no idea that that [May 12 Meeting] happened." Trial Tr. Vol. X, 2220. Mr. Tarrant believed that the "be cool" email was in response to a separate voicemail from Mr. Wortley. *Id.*

[22] Mr. Juranitch denied having spoken with Mr. Tarrant between May 10 and May 12; the first communication was the email on May 15th. Trial Tr. Vol. VI, 1357-58.

29 (reporting to Mr. Tarrant the final pricing for the Iowa project); P-74 ("We have been busy at Global working with Duke, Progress, and Alliant"). Mr. Tarrant testified that Global Energies was "dead" and "on its last breath." Trial Tr. Vol. IX, 1997-98. Mr. Tarrant and Mr. Juranitch were "trying to keep it floating, so, when we brought it back to life, . . . the public wouldn't know that we had this spat." Trial Tr. Vol. IX, 1997.

Mr. Tarrant testified that he received these emails while he was in France. Trial Tr. Vol. IX, 1961-62, 1965. Although Mr. Tarrant was better friends with Mr. Wortley than Mr. Juranitch at that time, Mr. Tarrant testified that he was "very surprised that . . . somebody [Mr. Juranitch] would just walk out." Trial Tr. Vol. IX, 1962-63. Mr. Tarrant testified that he was confused by the emails, specifically the email from Mr. Wortley claiming that Mr. Juranitch was "off the reservation." Trial Tr. Vol. IX, 1964; Ex. D1-G. Mr. Tarrant recalled thinking to himself "what have I got myself into here" and "what the heck is going on here?" Trial Tr. Vol. IX, 1964. Mr. Tarrant understood that Mr. Wortley and Mr. Juranitch were not getting along because of "something about a personal car that Jim [Juranitch] was supposed to be delivering to Joe" Wortley, but for Mr. Tarrant, these events did not "add up" to such drastic results. Trial Tr. Vol. IX, 1964; Vol. X, 2217-18 (May 14th was the first time that Mr. Tarrant understood the seriousness of the problems between Mr. Wortley and Mr. Juranitch). *See infra* note 57 and accompanying text. The emails from both Mr. Juranitch and Mr. Wortley caused Mr. Tarrant to become concerned about his one million dollar investment in Global Energies. Trial Tr. Vol. IX, 1964-65.

Upon Mr. Tarrant's return to the United States on either May 18 or 19, 2010, Mr. Wortley met Mr. Tarrant at the airport. Trial Tr. Vol. IX, 1967; Vol. III, 594; Vol. IV, 742; Vol. V, 1063. During this meeting with Mr. Tarrant, Mr. Wortley accused Mr. Juranitch of improperly charging personal expenses to Global Energies and authorized Mr. Tarrant to investigate Mr. Wortley's allegations against Mr. Juranitch. *Id.* In addition, Mr. Wortley gave Mr. Tarrant a binder of documents (including a copy of the consulting agreement, operating agreement, etc.) and a new key to the Deerfield Office because Mr. Wortley had changed the locks. *Id.* Mr. Tarrant asked Mr. Wortley if he could go over Global Energies' books and records, and Mr. Wortley authorized Mr. Tarrant to proceed with his own investigation of the bookkeeping.

Trial Tr. Vol. III, 622. Mr. Wortley believed he had delegated authority to Mr. Tarrant to settle the dispute between Mr. Wortley and Mr. Juranitch and "get the thing squared around and have Jim [Juranitch] back and the operations going." Trial Tr. Vol. III, 594; Vol. IV, 742; Vol. X, 2320-21. Mr. Wortley testified that he believed Mr. Juranitch's complaints were a "manufactured fight." Trial Tr. Vol. III, 594. Mr. Wortley told Mr. Tarrant that he would not "put any money in." Trial Tr. Vol. IV, 742; Vol. V, 1046 (Mr. Wortley testified that he "certainly was not going to put additional funds in [to Global Energies] until Mr. Juranitch came back," and he told Mr. Tarrant he did not expect him to invest additional funds either.). Then, Mr. Wortley left the country for a vacation in the Bahamas with his family for two weeks through June 6 or 7th, 2010. Trial Tr. Vol. III, 594-95, 622.

Mr. Tarrant then spoke with Mr. Juranitch on May 18th or 19th to hear his side of the story. Trial Tr. Vol. IX, 1967-69. Mr. Juranitch informed Mr. Tarrant about problems in the company, including the fact that Global Energies was "out of money," and Mr. Wortley had "cut off credit cards and cut off funds overall." Trial Tr. Vol. IX, 1968. Mr. Tarrant then emailed Mr. Wortley to report what Mr. Juranitch had told him, describing the experience as being "caught in a food fight between two supposed adult businessmen." Trial Tr. Vol. IX, 1969; Exs. D1-I; D2-A4. Mr. Wortley advocated a "let him stew in the mess he created" strategy in his email to Mr. Tarrant. Exs. D1-I; D2-A4. This did not sit well with Mr. Tarrant because he was concerned about the fate of Global Energies' employees and believed it wrong "to throw them out on the streets" on the heels of the last recession.[23] Trial Tr. Vol. IX, 1972; Exs. D1-I; D2-A4.

After speaking with both Mr. Wortley and Mr. Juranitch, Mr. Tarrant did not know whom to trust and became confused by the events unfolding before his eyes. Trial Tr. Vol. IX, 1975-76. Mr. Tarrant was

---

[23] Mr. Wortley claimed that at the end of May, he "wrote letters to every employee's home address, saying your check is here at 637 Jim Moran Boulevard, please come and get it, and tell us where you are. None of them did respond." Trial Tr. Vol. III, 623. Mr. Wortley described this effort as an attempt to pay the employees of Global Energies; however, the Court notes that Mr. Wortley's actual position was "very clear." Ex. D1-L. According to an email sent from Mr. Wortley to Mr. Tarrant on May 23, 2010, Mr. Wortley required "any employee that wants a paycheck . . . to write about their involvement in the 'theft in the night,'" referring to any efforts to help Mr. Juranitch remove his personal property and the plasma torches parts on May 12, 2010. Ex. D1-L.

leaning towards trusting Mr. Wortley because they were better friends, but Mr. Tarrant was adamant about not taking sides. Trial Tr. Vol. IX, 1975-76; Exs. D1-I; D2-A4. At one point, Mr. Tarrant considered the possibility that Mr. Juranitch and Mr. Wortley were "in cahoots" to harm him, especially after he discovered evidence of a separate company, unknown to him, called GE Research and Development.[24] Trial Tr. Vol. IX, 1976-78; Ex. D1-H7. As authorized by Mr. Wortley, Mr. Tarrant conducted his own investigation to determine which party – Mr. Wortley or Mr. Juranitch – was truthful. Trial Tr. Vol. IX, 1976.

To investigate Global Energies's bookeeping, Mr. Tarrant asked Mr. Roberts and Mr. Dan Wyland (a forensic accountant) to review Global Energies' books and records. Trial Tr. Vol. IX, 1980-81; V, 1063. Both men visited the offices in Deerfield where the books were kept and spoke with Mr. Wortley's employees, who kept the books.[25] Trial Tr. Vol. IX, 1981. Mr. Tarrant, Mr. Roberts, and Mr. Wyland discovered that Mr. Juranitch had charged personal expenses to Global Energies' accounts; however, these expenses were offset by payroll, and Global Energies actually owed Mr. Juranitch money at the time of their investigation.[26] Trial Tr. Vol. IX, 1982. The investigation also uncovered a journal entry for a $48,000.00 payment from Global Energies to Liberty, Mr. Wortley's company.[27] Trial Tr. Vol. IX, 1983.

---

[24] GE Research and Development was a company unknown to the Court. GE Research and Development was not a party to this case, and it was only mentioned briefly in two exhibits admitted into evidence – Mr. Tarrant's email to Mr. Juranitch and the proposed contract Mr. Wortley presented to Mr. Juranitch. Exs. D1-H7; D3-P21.

[25] The bookkeepers were employees hired by Mr. Wortley's company, Liberty. Trial Tr. Vol. IX, 1981.

[26] Mr. Juranitch had charged a trip to France on company credit cards, which he claimed was sanctioned by Mr. Wortley because the company credit cards had been used for the preceding two years to pay business and personal expenses. Trial Tr. Vol. VI, 1362-66. Mr. Juranitch stated that he never reimbursed Mr. Wortley for the trip to France because "the company [Global Energies] owed me [Mr. Juranitch] close to $50,000.00 at that time." Trial Tr. Vol. VI, 1367-68.

[27] Mr. Tarrant testified that Mr. Wortley claimed that the "nice round" payments to Liberty from Global Energies, including the $48,000, were for services performed by Liberty employees or payments on Mr. Wortley's grid note. Trial Tr. Vol. X, 2332. Mr. Wortley also testified that he did not embezzle any funds because the payments were made under his "grid note." Trial Tr. Vol. IV, 742; Vol. V, 1066. Mr. Tarrant has "never heard" of a grid note, but he understood from Mr. Wortley that it meant Mr. Wortley "could take money out anytime [he] want[ed], and [he] could put it back in as long as the company needed it." *Id.* Mr. Wortley admitted that the $48,000.00 was not applied to his grid note, as shown on his proof of claim. Trial Tr. Vol. V, 1068-69; D1-Y11. The Court has already ruled on the validity of the $48,000. In the Order Granting Chapter 11 Trustee's and Chrispus Venture Capital, LLC's Objections to Claim No. 1, the Court allowed Mr. Wortley's claim in the reduced amount of $203,193.57, which subtracted the $48,000 as a "reimbursement recognized by Wortley in the Claim." [D.E. 422 at 3, 6, 10-28935]; *see* discussion *infra* Section I.N.

Mr. Tarrant's accountants concluded that Mr. Wortley had misappropriated $48,000.00 in company funds. Trial Tr. Vol. IV, 742-43; Vol. V, 1064.

Mr. Tarrant became upset at Global Energies' sloppy bookkeeping and commingling of personal and business expenses. Trial Tr. Vol. IX, 1982-83; Vol. X, 2173. Mr. Tarrant was "upset and bewildered" by the missing funds, and he emailed Mr. Wortley to report that he found funds missing from Global Energies' accounts. Trial Tr. Vol. IX, 1983, 1985; Ex. D1-M. Mr. Tarrant testified, "if that money [the $48,000 that Mr. Wortley removed] were there in May, when you were threatening Jim [Juranitch] because there was no funds, or cutting off funds, you would have gotten through the payroll, that would have been enough, that 48, to get us through the payroll. My million dollars would have kicked in, and nothing like this would be going on, for that 48,000, it killed the company." Trial Tr. Vol. X, 2331.

Mr. Tarrant found himself "stuck in the middle of something, [he] never wanted to be in the middle of," and Mr. Tarrant wanted his million-dollar investment back. Trial Tr. Vol. IX, 1987, 1989; Ex. D1-N. Global Energies was broke, deadlocked, and shutdown; neither Mr. Tarrant nor Mr. Wortley – the only realistic sources of funding – were willing to invest any additional funds, including Mr. Tarrant's second million dollars. Trial Tr. Vol. VI, 1276, 1291-92; Vol. IX, 1987-88; Vol. X, 2337, 2334-35, 2338, 2340 (Mr. Tarrant testified that the breakup "between Mr. Juranitch and Mr. Wortley . . . basically put the company out of business" and "killed the company"). Mr. Wortley even stated that he did not believe Global Energies should borrow additional funds. Trial Tr. Vol. X, 2334-35. Mr. Tarrant testified that Global Energies was different after the breakup because it was "dead," and Tarrant believed that his risk had increased because "it would be crazy to put money into the company." Trial Tr. Vol. X, 2337.

**G. Mr. Tarrant and Mr. Roberts – Acting on Behalf of Chrispus – Attempted Negotiations to Reorganize Global Energies While Preparing for a Bankruptcy Filing.**

Over the next two months, Mr. Tarrant and Mr. Roberts, as the principals of Chrispus, attempted to negotiate a deal between the parties to reorganize Global Energies, while exploring the option of filing for bankruptcy. Trial Tr. Vol. X, 2322. On June 1, 2010, Mr. Tarrant retained Mr. Chad Pugatch as bankruptcy counsel on behalf of Chrispus. Trial Tr. Vol. VII, 1408. Mr. Pugatch determined that a

17

bankruptcy was an option because the deadlock among the Members and closure of the company prevented operation outside of bankruptcy. Trial Tr. Vol. VII, 1411. Mr. Pugatch further determined that Global Energies' Operating Agreement prevented a voluntary filing because the Operating Agreement required both managers to agree for any action to be taken or a supermajority of the members to file for bankruptcy, and Mr. Tarrant and Mr. Juranitch's interests together were insufficient. Trial Tr. Vol. VII, 1412-13; *see* discussion *supra* Section I.B. Thus, Mr. Pugatch determined that an involuntary filing, with Chrispus as the petitioning creditor, was only viable way to file the bankruptcy because Chrispus had an undisputed note and satisfied the creditor requirements. Trial Tr. Vol. VII, 1414-15, 1417. Mr. Pugatch recommended a Chapter 11 proceeding because it would satisfy Chrispus and Mr. Tarrant's objective to save the company, unlike a Chapter 7 that would have liquidated Global Energies. Trial Tr. Vol. VII, 1414. Mr. Pugatch prepared the Involuntary Petition, and Mr. Roberts signed it as a representative of Chrispus on June 8, 2010. [D.E. 1 at 2]. Mr. Pugatch testified that, although the Involuntary Petition was signed and ready to be filed, Chrispus wanted to attempt negotiations and not file the Involuntary Petition immediately, so Mr. Pugatch held onto the Involuntary Petition and did not recommend a time for filing it. Trial Tr. Vol. VII, 1417, 1419.

Mr. Tarrant and Mr. Roberts, without the aid of Mr. Pugatch, extended four offers to Mr. Wortley to restructure Global Energies and allow Mr. Wortley to keep a significant ownership interest.[28] Trial Tr. Vol. VI, 1290, Vol. VII, 1410. First, on June 8, 2010, the same day Mr. Roberts signed the Involuntary Petition, Mr. Tarrant emailed Mr. Wortley and issued his first offer to buy Mr. Wortley out for $200,000 (i.e. the amount of Mr. Wortley's investment) or allow Mr. Wortley to buy him out. Trial Tr. Vol. IX, 1990; Ex. D1-N. Mr. Wortley testified at trial that he refused Mr. Tarrant's offer to buy him out, and he refused to buy Mr. Tarrant out. Trial Tr. Vol. V, 1078; Vol. IX, 1990; Ex. D1-N.

Second, on June 13, 2010, Mr. Tarrant issued another offer to restructure Global Energies that would "divide the baby." Trial Tr. Vol. IV, 734-35; Vol. V, 1078. This second offer proposed that Mr. Wortley would receive the coal side of Global Energies' business and allow Mr. Tarrant and Mr. Juranitch

---

[28] Mr. Pugatch testified that he was not involved in negotiations with Mr. Wortley; however, Mr. Pugatch stated that he was copied on some of the emails relating to the negotiations. Trial Tr. Vol. VII, 1410.

to go forward with "things other than coal." Trial Tr. Vol. IX, 1990-91; Ex. D1-O. Mr. Wortley believed

that this offer would have taken Mr. Wortley "completely out of management," changed the ownership,

"split the baby" where Mr. Wortley would get part of Global Energies, and require Mr. Wortley to hold Mr.

Juranitch and Mr. Tarrant harmless. Trial Tr. Vol. IV, 734-35; Vol. V, 1078. Mr. Wortley testified at trial

that he turned down this proposal. Trial Tr. Vol. IX, 1992; Vol. IV, 758-59; Vol. V, 1080.

After the second offer, Mr. Tarrant decided to remove himself from the fighting in order to attempt

to preserve his friendships with Mr. Wortley and Mr. Juranitch. Trial Tr. Vol. IX, 1992. Mr. Tarrant did not

have enough authority to force an agreement between the two men, and they "wouldn't get along." Trial

Tr. Vol. X, 2322, 2283 (testifying that it was "not hard to read between the lines, you two guys [Mr. Wortley

and Mr. Juranitch] hated each other."). Around June 22, 2010, Mr. Tarrant "turned it all over to Ron

Roberts" and asked Mr. Roberts to "just take care of this." Trial Tr. Vol. IX, 1992; Ex. D2-Z.

Three days prior to the bankruptcy filing, Mr. Roberts extended a third offer to Mr. Wortley, which

proposed a new structure for Global Energies. Trial Tr. IX, 1994; Ex. D1-P. Under the third offer, Mr.

Wortley would be replaced by Mr. Wortley's "right-hand person, Bill Gates, as his representative on the

board of the company," or someone else of Mr. Wortley's choosing. Trial Tr. Vol. IX, 1995; Vol. V, 1082;

Ex. D1-P. Mr. Juranitch testified that he would have worked with Mr. Gates as a surrogate for Mr. Wortley.

Trial Tr. Vol. VI, 1295. The split of shares would be restructured to align with the additional capital

necessary to fund Global Energies' operations. Trial Tr. Vol. IX, 1995; Vol. X, 2337 (Mr. Tarrant believed

he would be entitled to more equity because he "would have had to put a lot more money in to fund the

company."). The adjustment in the equity of Global Energies upset Mr. Wortley, even though Mr. Wortley

was the party that initially demanded that the equity be restructured. Trial Tr. Vol. VI, 1392; *see* discussion

*supra* Sections I.C, I.D, I.E.

On June 30, 2010, Mr. Roberts followed up on the third offer, and Mr. Wortley admitted that he

failed to respond to Mr. Roberts' follow-up email. Trial Tr. Vol. V, 1083-84; Ex. D1-Q. One day later on

July 1, 2010, Chrispus, at the direction of Mr. Roberts, filed the Chapter 11 Involuntary Petition, which Mr.

Roberts signed as the Managing Member for Chrispus. [D.E. 1, Main]. On that same day, Mr. Roberts

emailed Mr. Wortley to notify him of the bankruptcy filing "due to the significant impasse created by the existing operating agreement, and the close down of all operations of Global Energies, and the apparent lack of willingness to restructure." Trial Tr. Vol. V, 1085; Ex. D1-R, P-41.

After the bankruptcy filing, Chrispus continued to attempt negotiations with Mr. Juranitch and Mr. Wortley through Mr. Roberts. On July 14, 2010, Mr. Roberts emailed Mr. Gates to explain, "the involuntary bankruptcy petition will remain in place until such time as an agreement is reached" and attached the proposals for restructuring the company. Trial Tr. Vol. V, 1087; Ex. D1-T. On July 16, 2010, Mr. Roberts left a voicemail for Mr. Gates, who was Mr. Wortley's representative, which summarized the terms of the latest restructuring proposal. Trial Tr. Vol. V, 1089; Ex. D1-U. Mr. Tarrant testified "Ron [Roberts] was trying to make this thing work, trying to get it restructured, trying to get back on track. He was trying anything and everything." Trial Tr. Vol. X, 2268; Vol. VI, 1281 (Mr. Juranitch agreed that Chrispus tried everything to reconcile before filing for bankruptcy).

On July 21, 2010, Mr. Roberts reached out to Mr. Wortley, Mr. Bill Gates, and Mr. Juranitch requesting a response from Mr. Gates concerning the third offer. Exs. D1-Z7, D1-V, D3-V4. Mr. Juranitch returned to the negotiation table and replied:

> It seems dumb to shoot the golden geese known as Global Energies. Joe, you many times have shown me how short life is on a tape measure. Is it really worth all the conflict? Bill, I had hoped you would engage in some sort of negotiations. Joe and Bill, I hate to see the two of you destroy any chance of this company becoming a success. It doesn't seem rational.

Id. At trial, Mr. Wortley described Mr. Juranitch's reply as the "first kind words that I heard from him in a long time." Trial Tr. Vol. V, 1093. Even these "kind words" could not persuade Mr. Wortley to respond to the offer, so Mr. Roberts reached out again to suggest a meeting. Id. Mr. Wortley refused the offer when he replied, "Ron, as long as you are trying to extort me with the bogus Federal Court action, I see no reason to meet with you." Id.

The efforts to negotiate dissolved, and the deadlock persisted. Mr. Wortley admitted on cross-examination that Mr. Juranitch and he could not agree, and that that state of affairs has continued since 2010 to the present time. Trial Tr. Vol. IV, 806. The parties ultimately began to blame each other for the

deadlock. Mr. Juranitch testified, "You [Mr. Wortley] blew up the company." Trial Tr. Vol. VI, 1391. Mr. Wortley blamed Mr. Juranitch for the breakup: "Mr. Juranitch had significant problems, and Global had significant problems as a result." Trial Tr. Vol. V, 1043, 1046-47 ("He [Mr. Juranitch] destroyed the company."), 1074 ("This is a very serious action that my co-managing member took, and it was up to him to resolve the issues, not me"); Vol. V, 1061 ("Mr. Juranitch exploded it."). Mr. Tarrant testified, "You two guys [Mr. Wortley and Mr. Juranitch] screwed it up." Trial Tr. Vol. X, 2339. Tellingly, neither Mr. Juranitch nor Mr. Wortley blamed Mr. Tarrant, Mr. Roberts, or Chrispus (i.e. the parties who filed the involuntary petition) for the breakup of the company.

## H. Mr. Juranitch and Mr. Pugatch Explained the "Smoking Gun" Emails and Provided Context for Planning Process Behind the Bankruptcy Filing.

During the negotiation process, Mr. Juranitch, Mr. Tarrant, and Mr. Roberts emailed several times to develop a "strategy" for how to approach Global Energies' future in conjunction with the future of the other companies they were developing. The thread of "smoking gun" emails sent between June 17 and 19, 2010 reproduced below[29] evidence the communications to develop such a "strategy." On Thursday, June 17, 2010, Mr. Juranitch emailed Mr. Tarrant and copied Mr. Roberts on that email stating:

Hello Rich,

The following is my humble attempt at presenting a strategy for Global Energies / Plasma Power starting next week. If you and Ron agree with the memo, I recommend we have Chad Pugatch review it, and add his insight. The plan is:

1. Rich communicates with Joe on Tuesday when he is back, and requests a response on the offer that Rich extended Sunday night, which expired last Tuesday. Rich gives Joe until the end of the business day.

2. If a meaningful response is received Rich and Jim start negotiating *in earnest to resurrect Global and move back into Deerfield under the new plan*. A two day window is given to Joe for a completed agreement.

3. If no meaningful response is received from Joe, Chrispus Ventures files for "Debtor in Possession" rights *under Chapter 11 law* on Wednesday. At that time hopefully Chrispus

---

[29] The Court elected to reproduce the "smoking gun" emails in their entirety without alterations, except to add emphasis on certain sections because mere excerpts of "smoking gun" emails have proved misleading in prior hearings.

Ventures becomes the trustee as the primary debtor, and the Debtor in Possession. I assume a judge will have to grant this situation.

4. As soon as a judge grants Chrispus the trustee position (hopefully in a week) Plasma Power LLC grants Global Energies (for additional debt to be used in later negotiations) a limited license to use its patent pending Feedwater technology to pursue the Iowa Job and other potential jobs specifically called out such as WE energies. This would be in keeping with *Chrispus's desire to make Global Energies profitable and get its primary debt repaid*. It also allows us to continue the sales effort with no drop in continuity. Robert Kain to be consulted on the limited license agreement, and his opinion as to its highest defendable value.

5. As soon as positive data is generated from Plasma Power's bench test next week, Jim is to begin the patent process on the feedwater system under the Plasma Power flag. Jim or Chrispus will assume the cost to file the patent. If desired the patent could be assigned to Plasma Power. Again Robert Kain should be consulted in this are.

6. It would seem that we should generate an operating agreement and any other relevant paperwork needed to formalize Plasma Power LLC as soon as possible (Next week) since the company is about to get a significant value in the form of the feedwater patent associated with it. The company is also wishing to do business in the form of granting licenses. Finally the company may have to stand up to a legal battle from Joe and needs to dot its I's and cross its T's. We may need to talk to Chad or his delegate about this and verify it is a meaningful step in this battle, and what specifically should be executed.

7. I am not clear how the Debtor in Possession eradicates the $200k note to Joe and how Joe's stock is dissolved. If this is accomplished in a bidding war to buy the complete assets of Global including the patents by its debtors then that is clear. If on the other hand the Debtor in Possession is to dissolve the company as an end game then we need to start spinning Plasma Power at this time. It may also become Global Plasma Power etc. I think we need to have this memo reviewed and a conference call with Chad to fill in the blanks at this point.

J[2]

Exs. P-37 at 3-4, D1-I4, P-83 (emphasis added). The next day on Friday, June 18, 2010, Mr. Tarrant responded to Mr. Juranitch's email and copied Mr. Roberts saying: "Lots to noodle…I agree in general but I doubt the patents are worth anything, either Globals or PPs.. I suggest you and ron pursue this strategy while I am here but keep me posted…" *Id.* (alterations in original). On Saturday, June 19, 2010, Mr. Roberts also responded to Mr. Juranitch's email and copied Mr. Tarrant and Mr. Tom Moody stating:

Rich/Jim: I agree we conference at the earliest convenient time once Rich arrives back in VT. I can be in VT to meet with you Rich on Tues (I am planning on being in VT on Weds & Thurs anyway). I have Tom Moody working on the appropriate documents (operating agreement, loan docs, non-compete agreement, confidentiality agreements, etc) and hope to have drafts by Monday or Tuesday at the latest.

Jim, as to your point 7, yes, Joe will have the opportunity to out bid us in the bankruptcy. *If we are successful in our reorganization plan then Global will continue to operate* otherwise the spin will have to be on Plasma power. I do like the idea of "Global Plasma Power". Lets have Tom (your brother Jim) search the www for conflicts at the same time getting Tom Moody to register the name. If we get the name we can just request a name change from the IRS and keep our current tax id.

Jim lets you and I confer on Monday morning and follow up as necessary.

Thanks

Ron.

Exs. P-37 at 2-3, D1-I4, P-83 (emphasis added).

Later that day, on Saturday, June 19, 2010, Mr. Juranitch emailed Mr. Pugatch and copied Mr.

Roberts, Mr. Tarrant, Mr. Tom Juranitch, Ms. Priscilla Boehme, and Mr. Alan Reynolds stating:

Hello Chad,

I would appreciate your review of my e-mail (first one at the bottom), and your insight into item 7. I think "I almost understand" but Ron and I would appreciate a conference call on Monday if you have time.

If you could also comment on Ron's memo I would appreciate it.

Finally I think we are pulling together a solid plan to go forward. The plan is as follows;

1. Plasma Power LLC will from this point forward have all feedwater, steam, syngas fuel feed, and simple cycle steam electrical generation patents, systems, developments, and licenses. The feedwater system seems to be taking off with instant acceptance in the market. We will want to limit this companies liability as much as possible because of the value of its IP. We will starting next week promote to the customer base the name of Plasma Power LLC for the products and systems noted above. As soon as Tom Juranitch gets successful testing accomplished on Plasma Power's ($P^2$) technology, patents will be filed and assigned to $P^2$.

2. *Global Energies LLC will if it becomes viable again have all reactor systems, CO2 processing, and combined cycle generation systems, including all existing patents, licenses, and developments up to the date that company was operational (May 20, 2010).* These systems are significantly more complex and follow a different technical direction. They also offer some different options to the market place. If the company continues, follow on technology related to these original concepts and pending patents will remain in the company, with the possible exception of "In Situe" work (Yet another market).

3. Another new company will be formed called Global Plasma Power LLC. *This company will purchase licenses from Plamsa Power LLC or Global Energies LLC to build facilities using their technology.* In other words it accepts the liability of building actual facilities. Once built if we own the facilities each location will be registered in its own Newco LLC.

These original 3 companies (Global Energies, LLC, $P^2$, Global Plasma Power LLC) will represent different entities to the market place with different responsibilities and liabilities. The lineage and purpose should be easy for our customer base to understand. Please let me

know if there are any holes in this logic. If not we will start executing next week. This also
allows us to move forward with the new companies and new ideas now, independent of
how the Global Energies battle turns out. As you know time is always critical in sales.
J[2]

Exs. P-37 at 2, D1-I4, P-83 (emphasis added).

Mr. Juranitch testified that he was not a party to the bankruptcy appeal that gave rise to this case, and this was his first opportunity to explain the events.[30] Trial Tr. Vol. VI, 1282-83. When questioned on his first email to Mr. Tarrant and Mr. Roberts, Mr. Juranitch explained that he wrote the email because he hoped the differences between the parties could be worked out, and he wanted to help with the negotiations. Trial Tr. Vol. VI, 1281, 1289. Mr. Juranitch testified that he wanted the company to be resurrected, and he understood that a bankruptcy would only be filed if all other efforts to resurrect the company failed. Trial Tr. Vol. VI, 1281. Mr. Juranitch stated that he had no understanding of bankruptcy; he had never been involved in a bankruptcy prior to the instant case; and he did not know the definition of an involuntary bankruptcy. Trial Tr. Vol. VI, 1279-81. Mr. Juranitch stated that Paragraphs 3 and 7 of his email demonstrated his "ignorance in the bankruptcy system" and show that he was "an engineer trying to understand the bankruptcy system." Trial Tr. Vol. VI, 1279-80. Mr. Juranitch simply wanted "someone to pull it [Global Energies] together." Trial Tr. Vol. VI, 1380. For this reason, Mr. Juranitch asked about having a trustee in the case from the beginning, and he only believed Chrispus might be the trustee because he did not understand bankruptcy. Trial Tr. Vol. VI, 1380. The Court found Mr. Juranitch's credible testimony regarding this email plausible because the emails, taken as a whole, reflect a desire to resurrect or restructure Global Energies and continue operations.

In addition to Mr. Juranitch's testimony, the Court heard Mr. Pugatch's testimony on the subject of the "smoking gun" emails. Mr. Pugatch explained that, after receiving the request from Mr. Juranitch,

---

[30] The Court notes that Mr. Juranitch testified at the original hearing on the Second Motion to Dismiss [D.E. 128, Main] on September 20, 2011; however, Mr. Juranitch was called as an adverse witness during the Plaintiff's case in chief. [D.E. 440, Main]; see discussion infra Section I.P. Further, Mr. Juranitch was not asked any questions concerning the "smoking gun" emails, and he provided no testimony on the "smoking gun" emails. [D.E. 440 at 131-196, Main]. The Court finds that Mr. Juranitch has not had the opportunity to provide direct testimony on the "smoking gun" emails and events that occurred after September 20, 2011.

he reviewed the "smoking gun" emails and responded to the emails to set up a conference call with Mr. Roberts and Mr. Juranitch to clear up the confusion. Trial Tr. Vol. VII, 1426-27; Ex. D2-H5. Mr. Pugatch testified that he told Mr. Juranitch, "his interpretation of what he put in here [the "smoking gun" emails] was very wrong, and I wanted to make sure it was clarified." Trial Tr. Vol. VII, 1423. Mr. Pugatch informed the Court that Mr. Juranitch's email was completely incorrect because Mr. Juranitch "didn't understand the terminology," which was very common for laypeople with no bankruptcy experience, like Mr. Juranitch. Trial Tr. Vol. VII, 1424-25. Mr. Pugatch testified that Mr. Juranitch's email was wrong because the parties never planned to move for Chrispus to be the Debtor-In-Possession because this result would have been impossible under the Bankruptcy Code, which only allowed Global Energies to be the Debtor-in-Possession. Trial Tr. Vol. VII, 1424. Further, Mr. Pugatch explained that Chrispus always wanted a trustee appointed because of the deadlock between the members. *Id.* Mr. Pugatch supported his testimony by explaining that, after Chrispus filed the Involuntary Petition, Chrispus quickly moved for the appointment of a trustee due to the deadlock that existed before and after the filing. Trial Tr. Vol. VII, 1431; Ex. D2-F2.

Regarding the alignment of the parties, Mr. Pugatch testified that he did not think Mr. Tarrant and Mr. Juranitch's interests were completely aligned, but Mr. Pugatch acknowledged that Mr. Tarrant and Mr. Juranitch were speaking to each other and "working together to salvage the company." Trial Tr. Vol. VII, 1411. Mr. Pugatch admitted on the record that Mr. Juranitch and Mr. Tarrant had sided together because Mr. Juranitch had the technology, and Mr. Wortley offered little actual value to the company. Trial Tr. Vol. VII, 1487. Mr. Pugatch explained that the parties had a right to talk, and the fact that the parties were talking and had formed Plasma Power was openly disclosed in the record before Mr. Wortley. Trial Tr. Vol. VII, 1487; VIII, 1832. Mr. Pugatch maintained that there were good faith reasons for filing the bankruptcy, and any cooperation between Mr. Tarrant and Mr. Juranitch was irrelevant. Trial Tr. Vol. VII, 1487.

After having reviewed the "smoking gun" emails and heard the explanations on the context behind the emails, this Court determined that, although paragraph seven of Mr. Juranitch's email referenced "eradicate[ing] the $200k note to Joe and how Joe's stock is dissolved," the emails revealed the parties' intention to reorganize Global Energies. Exs. P-37, D1-I4, P-83. First, Mr. Juranitch's original email

explained that "Rich and Jim [would] start negotiating in earnest to resurrect Global and move back into Deerfield under the new plan," Chrispus would file bankruptcy under Chapter 11 to reorganize, and "Chrispus's desire[d] to make Global Energies profitable and get its primary debt repaid." Exs. P-37 at 3-4, D1-I4, P-83. Second, Mr. Roberts' response emphasized, "If we are successful in our reorganization plan then Global will continue to operate." *Id.* at 2-3. Finally, Mr. Juranitch's second email, discussing their business plans, incorporated Global Energies as a key part of the business plan, which showed that Defendants did not intend to liquidate Global Energies. *Id.* at 2. After reviewing the evidence, this Court cannot fault the Defendants for their attempts to reach a settlement and resolve deadlock, even if their attempts ultimately failed.

**I. Mr. Tarrant and Mr. Juranitch Formed Plasma Power with Novel Technologies, and They Failed to Profit from either the Bankruptcy Filing or Plasma Power.**

After the breakup, Mr. Tarrant and Mr. Juranitch formed Plasma Power. Mr. Tarrant testified that they had to form Plasma Power because "we were stuck with employees." Trial Tr. Vol. X, 2167. According to Mr. Juranitch, the employees chose to leave with him; Mr. Juranitch did not ask them to follow him; and they were at home, not working for Global Energies elsewhere. Trial Tr. Vol. IX, 1936-38. Chrispus was paying Global Energies' former employees because Mr. Tarrant "had to pay them, somebody had to pay them. You can't just throw them out." Trial Tr. Vol. X, 2167; *see supra* note 23 and accompanying text. After Mr. Wortley locked the employees out of Global Energies' facilities, Chrispus began paying the employees, and Mr. Tarrant "started a company [Plasma Power] just to hold them and see where this whole thing came out." Trial Tr. Vol. X, 2167-68. Eventually, Mr. Tarrant and Mr. Juranitch began moving forward with Plasma Power. *Id.*

During negotiations and the time leading up to the bankruptcy filing, Mr. Tarrant testified that they were trying to "keep both [Plasma Power and Global Energies] afloat." Trial Tr. Vol. X, 2168, 2282-83 "We were trying to juggle all of this stuff so we don't kill Global Energies, but we still keep moving forward with Plasma Power." *Id.* Mr. Tarrant stated that Plasma Power and Global Energies used different technologies, so "for certain technologies, that Global [Energies] was more attuned to, we'd use that, and

for other situations, we'd use Plasma [Power]." Trial Tr. Vol. X, 2168. "At one time, we even talked about having a parent company called Global Plasma Power, but we were trying to keep everything – we were juggling, keeping things going." Trial Tr. Vol. X, 2168; *see* discussion *supra* Section I.H. "*We didn't want Global to go away.*" Trial Tr. Vol. X, 2168 (emphasis added).

The parties agreed that neither Plasma Power nor Global Energies ever had a binding contract with any municipality, county, state, or private agency to build a plant. Trial Tr. Vol. X, 2170, 2174; Vol. VI, 1353; *see* discussion *supra* Section I.C. Although, Plasma Power did have a Memorandum of Understanding with the City of Marion, Iowa and received a down payment in the amount of $95,000 from Marion, Iowa under that garbage contract in December 2010. Trial Tr. Vol. IV, 725; Vol. X, 2162, 2180-81, Vol. VI, 1367, 1378 (Mr. Juranitch recalled receiving the $95,000 check, but he did not recall why they received it); Ex. P-93. Despite this inability to land a contract, Mr. Tarrant is still putting money into Plasma Power because he "hope[s] to profit." Trial Tr. Vol. X, 2177-78.

Mr. Juranitch explained that there were multiple projects involving the state of Iowa. Trial Tr. Vol. VI, 1298. The first Iowa project was in late 2008 or early 2009 and involved "sequestering $CO_2$ working with Alliant Energy using Global technology to suck the $CO_2$ out of their exhaust of that coal power plant." Trial Tr. Vol. VI, 1298. The second Iowa project was the subject of the breakup in May of 2010, and it failed because of competition with Alliant. Trial Tr. Vol. VI, 1299-300, 1377. The Iowa deal could have brought in a profit margin of 5.2 million dollars; however, the project did not sell. Trial Tr. Vol. VI, 1376; Ex. P-29. After these two projects failed, Mr. Juranitch made another, separate pitch to Iowa under the name Global Plasma Power. Trial Tr. Vol. VI, 1300. This new pitch was outside of Global Energies' operating agreement, and Mr. Juranitch intended to license the pitch to Global Energies, if the pitch was successful and Global Energies was resurrected. Trial Tr. Vol. VI, 1300, 1391; *see* discussion *supra* Section I.H. Mr. Juranitch denied using any of Global Energies' technology to make this third pitch. Trial Tr. Vol. VI, 1300.

Dr. Ryan P. O'Connor provided credible, expert witness testimony[31] regarding whether the Plasma Power patents and patent applications were "somehow a re-filing or a continuation of . . . any Global Energies' patent applications." Trial Tr. Vol. IV, 683. Dr. O'Connor concluded, "There were no patents or patent applications that were transferred from Global [Energies] to Plasma [Power]." Trial Tr. Vol. IV, 687. Further, Global Energies only had one patent application, entitled "Recycling and Reburning Carbon Dioxide in an Energy Efficient Way," assigned to it and recorded with the patent offices. Trial Tr. Vol. IV, 687. That patent application has lapsed, is inactive, and has been abandoned. Trial Tr. Vol. IV, 687-88; Vol. VI, 1340; Vol. IX, 1927. Mr. Juranitch assigned no other patents to Global Energies. Trial Tr. Vol. IV, 688.

Regarding Plasma Power's patents, Dr. O'Connor testified that his "final conclusions were that *nothing in the Plasma Power portfolio is in any way some sort of continuation or re-filing of anything in the Global Energies portfolio*." Trial Tr. Vol. IV, 698 (emphasis added). Plasma Power has one issued patent and ten families of patent applications. Trial Tr. Vol. IV, 688. None of the Plasma Power patents or patent applications were assigned or transferred from Global Energies. Trial Tr. Vol. IV, 689. Dr. O'Connor testified that Plasma Power's patent and patent applications were not informally transferred from Global Energies, and the Plasma Power technology was not a mere continuation of Global Energies' technology. Trial Tr. Vol. IV, 690. The Plasma Power technology, patents, and patent applications *do not relate* to Global Energies' technologies. Trial Tr. Vol. IV, 691-92. Dr. O'Connor concluded that Plasma Power's technologies were "entirely new technologies," and "there is absolutely no overlap." Trial Tr. Vol. IV, 692, 696. Dr. O'Connor opined that it was "remarkable, even in a case where technologies are different, that there is not some overlap somewhere, you know, even a .1 percent overlap, but here there was *absolutely*

---

[31] Dr. O'Connor has an extensive educational background in chemical engineering having graduated summa cum laude with a bachelors of science degree in chemical engineering from the University of Notre Dame and completed a Ph.D. in chemical engineering at the University of Minnesota. Trial Tr. Vol. IV, 680. Dr. O'Connor is admitted to the patent bar, has been admitted to the American Institute of Chemical Engineers for twenty-three years, and has a practice as a patent agent drafting and reviewing patents for his clients for the past eleven and a half years. Trial Tr. Vol. IV, 680-82, 699-700. There was no objection at trial to allowing Dr. O'Connor to testify as an expert, and the court admitted his expert testimony. Trial Tr. Vol. IV, 683. Dr. O'Connor charged his "standard hourly rate for patent prosecution, $360 an hour" and spent around 100 hours on the case for a total approximate price of $36,000.00. Trial Tr. Vol. IV, 705. Dr. O'Connor agreed that his fees were not contingent upon the outcome of the case. Trial Tr. Vol. IV, 706, 716.

*zero.*" Trial Tr. Vol. IV, 710 (emphasis added). Even Mr. Wortley admitted that he has "*no proof*" of Plasma

Power using the same technology as Global Energies, and Mr. Wortley failed to provide the Court with any

evidence to rebut Dr. O'Connor's expert testimony. Trial Tr. Vol. VI, 1206 (emphasis added).

Mr. Richard A. Pollack, a certified public accountant licensed in the state of Florida, provided

credible, expert witness testimony[32] regarding his analysis of "the books and records of . . . Plasma [Power,

LLC] and Axenic [Power, LLC][33] . . . and [determination of] whether there were any profits that were made,

and whether there were any distributions of profits to Richard Tarrant or to Chrispus." Trial Tr. Vol. VI,

1219-20. Mr. Pollack reviewed the books and records, ledgers, QuickBooks, tax returns, etc. and spoke

with Mr. Roberts, Mr. Kevin Gabralt, Mr. Juranitch, and Ms. Priscilla Boehme to make his determination.

Trial Tr. Vol. VI, 1222-23. Mr. Pollack's assignment was limited to the years 2010 through 2016 for Plasma

Power and 2012 through 2016 for Axenic. Trial Tr. Vol. VI, 1224.

Mr. Pollack testified that neither Plasma Power nor Axenic ever generated a profit. Trial Tr. Vol.

VI, 1225. Plasma Power generated losses of "approximately $12 million," and Axenic generated a loss of

"approximately $12 million" – creating a combined loss of $24 million. Trial Tr. Vol. VI, 1225-26. Plasma

Power and Axenic only made one disbursement, which Mr. Tarrant received as "a $2,900.00 expense

reimbursement." Trial Tr. Vol. VI, 1226. Mr. Pollack determined that "there were no significant

customers;" "there were no contracts with any customers;" and "as a result, there was no evidence of any

repayment." Trial Tr. Vol. VI, 1227. The $24 million value attributed to Chrispus' notes had an actual value

of zero. Trial Tr. Vol. VI, 1227. Neither Chrispus nor Mr. Tarrant received a profit from the investments in

Global Energies, Plasma Power, or Axenic.[34] Trial Tr. Vol. VI, 1227-28, 1230. Mr. Pollack's expert

---

[32] Mr. Pollack is a Certified Public Accountant, who has worked with the Berkowitz Pollack accounting firm for twenty-six years as a director of the firm in charge of the forensic and business valuation section. Trial Tr. Vol. VI, 1216-17. Mr. Pollack graduated *cum laude* with a bachelor's degree in business administration from the University of Miami, and he graduated *cum laude* with a master's degree in finance from Florida International University. Trial Tr. Vol. VI, 1217. Mr. Pollack belongs to the American Institute of Certified Public Accountants and the Florida Institute of Certified Public Accountants, and he has testified in multiple bankruptcy courts as an expert witness. Trial Tr. Vol. VI, 1218.

[33] Axenic Power, LLC is an additional company started by Mr. Tarrant and Mr. Juranitch.

[34] Any income received during this time reduced to a net loss once the companies books were taken together. Trial Tr. Vol. VI, 1230-31.

testimony is consistent with the testimony of Mr. Tarrant and Mr. Juranitch. Mr. Tarrant testified that he had made zero profit from the transaction, and he had lost "over $25 million."[35] Trial Tr. Vol. X, 2176. Mr. Juranitch also testified that he has not profited from the filing of the bankruptcy.[36] Trial Tr. Vol. VI, 1306-07.

**J. Global Energies had a Value of Zero at the Time of the Bankruptcy.**

Mr. Wortley's expert witness, Mr. Michael McCarty provided testimony[37] primarily regarding the valuation of Global Energies. Trial Tr. Vol. II, 317-18, 322-23. Mr. McCarty claimed that forming an analysis of the valuation of Global Energies was "a little unusual" because he did not have access to "extensive discovery;" there was no . . . financial performance, no forecast, no post-bankrupt analysis." Trial Tr. Vol. II, 320. As a result, Mr. McCarty's valuation for Global Energies is limited to "late April, early May of 2010." Trial Tr. Vol. II, 320. Mr. McCarty concluded that:

> The value of Global in May 2010 using an appropriate third party comparable company such as SES who was available to complete an arm's length transaction with Global at that date is in my opinion at least $20 million. Additionally, I believe given the prudent use of funds to continue the development of the Global technology and experienced managers from SES the upside value available to the owners of Global could have been perhaps multiples of that static value as of June 2010. A proxy for that upside current value should be the calculated May 2010 value of $20 million translated to the current time using the appropriate discount rate or earnings rate of the Appellant of 35%. Doing this calculation results in a translated current value of Global to be approximately $70 million. However, as a capital markets and merger expert I would expect the minimum value that should be attributed to the Appellant would be his ownership percentage pre filing (32%) times the determined 2010 value of $20 million for Global plus the appropriate earning rate from that date to the current time.

---

[35] The Court finds that Mr. Tarrant's testimony on his estimate of a $25 million loss close enough to the $24 million loss cited by Mr. Pollack to be considered consistent.

[36] Mr. Juranitch has been and is currently employed by Plasma Power. Trial Tr. Vol. IX, 1887. He does not receive a salary from Plasma Power; instead, he takes a loan. Between all three of the companies for which he works, the loan is $370,000 per year. Trial Tr. Vol. IX, 1890.

[37] The Court notes that Mr. McCarty has been "a full-time investment banker" for forty to forty-two years. Trial Tr. Vol. II, 299. Mr. McCarty graduated with honors from Vanderbilt University with an undergraduate degree in physics, and he graduated from the Wharton School at the University of Pennsylvania with an MBA in finance. Trial Tr. Vol. II, 297. Mr. McCarty has worked for a "series of major investment banks," including Citicorp, Dillon Reed, SG Warburg, and others. Trial Tr. Vol. II, 299-300. Mr. McCarty testified that he had served as the "deal captain," which is the lead position, for multiple small and large transactions. Trial Tr. Vol. II, 304-05. Approximately twenty-five percent of Mr. McCarty's business dealt with the energy sector. Trial Tr. Vol. II, 306. Mr. McCarty has produced approximately one hundred valuation models for alternative energy companies. Trial Tr. Vol. II, 309. Mr. McCarty has testified as an expert in approximately a dozen cases regarding investment banking. Trial Tr. Vol. II, 314. There was no objection at trial to allowing Mr. McCarty to testify as an expert, and the court admitted his expert testimony. Trial Tr. Vol. II, 316-17.

This May 2010 value is further confirmed by Tarrant's investment in June 2009 at $20 million, comparable series B pre-revenue financings, SES early financings and value post major contract completion by Global discounted back to 4/10 prior to the bad acts of the defendants.

The 2010 Transaction Value for Global, in my opinion, must be interpreted not as a bad faith bankruptcy filing as occurred in July 2010 but rather as a market-priced Transaction and one that could be completed, which could have been done at arm's length by sophisticated participants absent the filing. The 2010 Transaction, including its structure and timing, was validated by the history of SES from 2007-2009 including investment by over 100 institutions involving $180 million in investments in the SES. The valuation is further confirmed by the discussion that I personally had with Wortley, Tarrant, SES and other investors and interested parties and the methodologies explained earlier of Tarrant's investment, earlier SES rounds of financing, comparable pre-revenue round of financings and the future potential of Global Energies. This all leads me to the conclusion of $20 million for the unimpeded value of Global Energies in May 2010 prior to the bad conduct of the defendants and the bad faith filing of bankruptcy.

Trial Tr. Vol. II, 360-62; Ex. P-122 at 21; D.E. 378 at 21-22. In summary, Mr. McCarty testified that the current value of Global Energies is $70 million and that Mr. Wortley's share of the company is worth $20 million.[38]

The Court disregarded Mr. McCarty's valuation because the Court found that Mr. McCarty's valuation was unreliable, speculative, irrelevant, and revealed Mr. McCarty's bias and prejudice. The valuation was irrelevant because it only pertained to the period of late April to early May – approximately two months before the filing of the bankruptcy.[39] Trial Tr. Vol. II, 320. Mr. McCarty believed there was no difference in the value of the company between May and June 2010 because he believed the breakup events in May left the valuation unaffected. Trial Tr. Vol. II, 436. Mr. McCarty thought, "The prospects for the company should have been the same." Trial Tr. Vol. II, 436. While Mr. McCarty failed to incorporate the breakup, Mr. McCarty admitted that the breakup and Mr. Juranitch's departure (with the knowledge and technology necessary to operate Global Energies) would have been important for a potential merger partner to consider before investing in Global Energies. Trial Tr. Vol. II, 427. The Court found that the relevant

---

[38] The Court observed that Mr. McCarty's estimation of $20 million for Mr. Wortley's share of the company matches Mr. Wortley's proof of claim [3-1] for the amount of $20 million exactly. *See* discussion *supra* Section I.N.

[39] The Court notes that Mr. McCarty's Expert Report states that his findings were for the month of June 2010; however, Mr. McCarty modified this on the stand and testified that the valuation was actually for the month of May 2010. Trial Tr. Vol. II, 436; D.E. 309 at 10.

time for determining the value of Global Energies was the time of the filing of the bankruptcy on July 1, 2010, and Mr. McCarty's valuation disregarded key events in the month of May that affected that valuation.

Even if the Court found the valuation relevant, the Court found that Mr. McCarty's valuation was unreliable and unreasonably speculative. First, Mr. McCarty admitted that his valuation was speculative. Trial Tr. Vol. II, 441, 451. Second, Mr. McCarty based the valuation on a hypothetical merger with another company – SES – that never occurred, never moved past the speculative state, and was rejected by Mr. Tarrant, a member of Global Energies. Trial Tr. Vol. II, 451-52; Ex. P-122 at 10; *see* discussion *supra* Section I.C. By basing the valuation on a hypothetical merger, the valuation incorporated capital that was actually unavailable to Global Energies.

Third, Mr. McCarty testified that his valuation depended upon Global Energies having "access to the technology;" however, Global Energies no longer had access to the technology. Trial Tr. Vol. II, 446-48; *see* discussion *supra* Sections I.B, I.C, I.D, I.E. Mr. McCarty had no knowledge of whether Global Energies actually had access to or ownership of the technology. Trial Tr. Vol. II, 448. Mr. McCarty did not know how many patents Global Energies owned, never conducted a patent search, and would not normally do a such search for technology company valuation. Trial Tr. Vol. II, 430-32. Mr. McCarty's disregard for whether Global Energies – an alternative energy company – had access to the alternative energy technology makes Mr. McCarty's valuation completely unreliable.

Fourth, Mr. McCarty failed to consider the objectives of the investors – Mr. Tarrant and Mr. Juranitch – because he never spoke with Mr. Juranitch and he only briefly conversed with Mr. Tarrant. Trial Tr. Vol. II, 435. By failing to consider the investors' objectives, Mr. McCarty disregarded the supermajority requirement in Global Energies' Operating Agreement, "which basically required both managing members to approve." Trial Tr. Vol. II, 449; *see* discussion *supra* Section I.B. In order for the merger with SES to occur and become relevant to the valuation, Mr. McCarty needed the agreement of both managing partners – Mr. Wortley and Mr. Juranitch. *Id.* Mr.  Mr. McCarty had "seen mergers fall apart because of a disagreement between shareholders." Trial Tr. Vol. II, 451. Incredibly, Mr. McCarty was not aware of the deadlock in Global Energies when preparing his expert report. Trial Tr. Vol. II, 383.

Even if the Court could find the valuation relevant and reliable, the Court would still refrain from utilizing Mr. McCarty's opinion because his testimony revealed his bias in favor of Mr. Wortley and prejudice against the Defendants. First, Mr. McCarty disclosed that he and Mr. Wortley are long-time friends because they met while golfing in Bermuda in 1996. Trial Tr. Vol. II, 393-94. Second, Mr. McCarty is not a neutral party because Mr. McCarty disclosed in his testimony and outlined in detail in his demonstrative exhibit how Mr. Wortley had approached Mr. McCarty early in 2009 with the intent to hire him as an investment banker for Global Energies. Trial Tr. Vol. II, 323-24; D.E. 378 at 17. Mr. Wortley requested that Mr. McCarty aid in the negotiations for a merger to provide additional capital, and Mr. McCarty suggested the merger between Global Energies and SES, for whom Mr. McCarty served as an investment banker. Trial Tr. Vol. II, 327-28; *see* discussion *supra* Section I.C. Mr. McCarty had an engagement letter and a draft agreement with Global Energies, but Mr. McCarty never contracted to work with Global Energies. Trial Tr. Vol. II, 328-29, 378-79. On July 20, 2010, Mr. Wortley contacted Mr. McCarty to let him know that the deal would not happen because of the bankruptcy filing. Trial Tr. Vol. II, 345-46. Mr. McCarty considered Global Energies "to be a potential client," and Mr. McCarty had a personal interest in encouraging a merger between Global Energies and SES. Trial Tr. Vol. II, 326. Finally, Mr. McCarty revealed his prejudice against the Defendants because he based his value of Global Energies on the "bad acts of defendants" and assumed that the bankruptcy case was filed in bad faith. Trial Tr. Vol. II, 361, 418. Further, Mr. McCarty's personal opinions were included in his valuation because he incorrectly believed that the value of Mr. Wortley's ownership was taken away from him "as part of the filing of the bankruptcy process." Trial Tr. Vol. II, 422.

The most salient portion of Mr. McCarty's testimony is Mr. McCarty's admission that the value of Global Energies was zero, if Global Energies had not been transferred to another party and operations were shut down after the managing members' breakup in May. Trial Tr. Vol. II, 444. At the time of the bankruptcy filing on July 1, 2010, Global Energies' operations were shut down; the managing members were deadlocked; Global Energies did not have ownership of or access to the necessary technology; Global Energies had no capital or cash; none of the parties were willing to invest additional capital; and Global

Energies never merged with another entity. *See* discussion *supra* Sections I.C, I.D., I.F. Thus, the Court found that the value of Global Energies, at the time of the filing of the bankruptcy, was zero.

**K. Chrispus had Good Faith Purposes for Filing the Involuntary Petition.**

Mr. Tarrant testified consistently on direct examination, cross examination, and re-cross examination that "[t]he purpose of the filing [was] to get it [Global Energies] into a position where we could move on and do something with it, and reorganize it, restructure it, whatever bankruptcy is." Trial Tr. Vol. X, 2155-56, 2259-60 ("Our goal was to restructure Global [Energies] and keep it going"), 2265 ("I still hadn't given up on trying to put this thing back together"), 2285 ("Restructure, reorganize it, get it going."), 2339 ("We tried to resurrect it [Global Energies]."). Mr. Tarrant testified, "The farther we went on, the more problems we were having in terms of ever seeing Global [Energies] come back, but we didn't want to give up on it quite yet." Trial Tr. Vol. X, 2283.

Mr. Tarrant and Mr. Roberts began looking into the possibility of a bankruptcy around May 27, 2010. Ex. P-33. Mr. Tarrant met with Mr. Pugatch prior to the filing "to look into bankruptcy, because the company was dead, and broke, and so we had to figure out what to do with it." Trial Tr. Vol. X, 2154. Mr. Tarrant did not know much about bankruptcy (including the difference between Chapter 7 and 11 bankruptcies), and he "had nothing to do with that kind of decision," referring to the technical aspects of filing a bankruptcy case. Trial Tr. Vol. X, 2154-55. Mr. Tarrant never intended to remove Mr. Wortley from Global Energies through the bankruptcy. Trial Tr. Vol. X, 2225. When asked directly by Mr. Wortley if Mr. Tarrant had a "plan to get rid of me [Mr. Wortley]," Mr. Tarrant responded, "No, not at all. Not at all. . . . You're my friend, you got me into this." *Id.*

Mr. Wortley testified inconsistently when he speculated as to the purpose of the bankruptcy filing. Mr. Wortley testified that the "petition was not filed because of payments to creditors. It was filed only because they couldn't get me to restructure the way they wanted to." Trial Tr. Vol. III, 614. Mr. Wortley believed that "Mr. Juranitch had agreed with certain of these [negotiation] proposals," but "I [Mr. Wortley] did not agree with any of the proposals." Trial Tr. Vol. III, 623. Mr. Wortley testified that Mr. Roberts informed him that because "I [Mr. Wortley] would not change the stock ownership, that they filed an

involuntary." Trial Tr. Vol. IV, 744. Later, Mr. Wortley stated that the "reason they filed [the Involuntary Petition] was the non-payment of the interest, and there was no notification given to me [Mr. Wortley] that that was there, and when it did happen I sent a check." Trial Tr. Vol. IV, 744. Then, Mr. Wortley testified that he thought "Mr. Tarrant was using the bankruptcy to get Jim [Juranitch] back to the table." Trial Tr. Vol. IV, 817.

The initial filings in the bankruptcy case (i.e. the Involuntary Petition [D.E. 1, Main] and the Motion for Appointment of Chapter 11 Interim Trustee [D.E. 4, Main]) alleged that Global Energies was "generally not paying such debtor's debts as they become due" and "the Board and Members [were] deadlocked and [could not] manage Global [Energies]." [D.E. 1 at 1; 4 at 2]. After hearing the evidence and testimony concerning the purpose of the filing, this Court found that these statements made in the initial filings were correct, and the reasons for the filing of the bankruptcy were: 1) Global Energies was not paying the debts as they became due, and 2) the parties were hopelessly deadlocked. (Mr. Wortley even admitted that the parties were deadlocked. *See* discussion *supra* Section I.E. Mr. Tarrant, Mr. Roberts, and Chrispus formed the more neutral party, who sought consistently to resolve the deadlock, restructure Global Energies, and provide a cash infusion through the Trustee's sale of the assets.

## L. Commencement of Bankruptcy and State Court Cases

On July 1, 2010, Petitioning Creditor Chrispus filed a Chapter 11 Involuntary Petition for Global Energies, [D.E. 1, Main] and the Court entered the Order Granting Ex-Parte Motion for Entry of Order for Relief Against Global Energies on August 3, 2010. [D.E. 13, Main]. Mr. Wortley never contested the Chapter 11 Involuntary Petition or appealed the entry of the Order for Relief. Although Mr. Tarrant was involved with discussions prior to the filing regarding the possibility of bankruptcy, Mr. Tarrant had delegated the authority to make decisions regarding Global Energies to Mr. Roberts. Trial Tr. Vol. X, 2292-94, 2336. Neither Mr. Tarrant nor Mr. Juranitch knew that the Petition had been signed by Mr. Roberts and filed with the Court. Trial Tr. Vol. X, 2292-94, 2336, 2269. Mr. Wortley informed Mr. Tarrant of the bankruptcy. Trial Tr. Vol. X, 2295.

At the time of the bankruptcy filing, Global Energies was in default on both Chrispus' Note and Mr. Wortley's Note.[40] Trial Tr. Vol. V, 1060-61. Mr. Wortley claimed that he did not know that Mr. Roberts had signed the involuntary bankruptcy petition on June 8, 2010, and he did not know that Mr. Roberts was demanding interest on the Note. Trial Tr. Vol. III, 623; Vol. V, 1115 (Mr. Tarrant and Mr. Wortley did not discuss the interest payment).  After Mr. Wortley discovered the demand for interest payment, he "went and . . . got a check and sent it to them." Trial Tr. Vol. III, 623; Vol. V, 1115-17 (The funds for the interest payment came from Mr. Wortley's personal funds, not Global Energies' assets, because Global Energies did not have any funds). Mr. Wortley disingenuously claimed that this action "showed my willingness to put money into Global, *it's just that Mr. Juranitch had to ask for it.*" Trial Tr. Vol. III, 623; Vol. V, 1046 (Mr. Wortley wanted Mr. Juranitch to come to him and request money for Global Energies.) (emphasis added); *but see* discussion *supra* Section I.F. Mr. Roberts refused to accept the interest payment from Mr. Wortley because it was a "postpetition payment on unsecured debt." Trial Tr. Vol. III, 624. The Trustee requested turnover of the check, after it was returned to Mr. Wortley; Mr. Wortley complied; and the Trustee cashed the check. Trial Tr. Vol. III, 624-25.

The debt owed to Chrispus was "never . . . disputed." Trial Tr. Vol. V, 1111.  Under the Chrispus Note, if the borrower (i.e. Global Energies) admits in writing that it cannot pay debts as they come due, then a default is triggered.[41] Trial Tr. Vol. V, 1112. Global Energies' Chief Engineer admitted in writing that Global Energies could not pay its expenses for three weeks leading up to May 12, 2010. Ex. D1-H. When confronted with these facts, Mr. Wortley replied that he "interpret[ed] it [the Chrispus Note] differently." Trial Tr. Vol. V, 1113. Mr. Wortley believed that "if the CEO of a company decides he's not going to pay anybody . . . that does not qualify under this clause." Trial Tr. Vol. V, 1114.  In the same breath, Mr. Wortley admitted that Global Energies did not have cash to pay the expenses. Trial Tr. Vol. V,

---

[40] Mr. Wortley filed a UCC Statement to secure his Note in June of 2010. Trial Tr. Vol. V, 1060-61.
[41] Under the Chrispus Note, presentment is waived, which means Chrispus had no duty to provide notice of the default. Trial Tr. Vol. V, 1114.

1113. Mr. Wortley felt justified in withholding payment/cash for employees and other expenses because of Mr. Juranitch's actions. Trial Tr. Vol. V, 1113.

Six days after the filing of the Petition, Chrispus filed a Motion to Appoint Trustee [D.E. 4, Main], Mr. Wortley agreed to the appointment of a trustee [D.E. 12, Main], and the parties entered an Agreed Order Authorizing and Directing Appointment of a Chapter 11 Trustee [D.E. 16, Main]. Trial Tr. Vol. V, 1053. On August 18, 2010, the Court approved the appointment of Barry E. Mukamal as Chapter 11 Trustee (the "Trustee"). [D.E. 34, Main].[42]

On October 28, 2010, Mr. Wortley filed a lawsuit in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (the "State Court") against Richard R. Tarrant, Chrispus, James C. Juranitch, Plasma Power LLC, and Ronald Roberts. *Wortley v. Tarrant*, 50-2010-CA-027345-XXXX-MB. The State Court Complaint alleged constructive fraud, constructive trust, abuse of process, and breach of fiduciary duty against Mr. Tarrant; and conspiracy to defraud against Mr. Juranitch. *Id*. at 5. The factual allegations raised by Mr. Wortley in the Complaint mirror the allegations raised in his motions to dismiss the bankruptcy case for bad faith. At the time of entry of this order, the State Court case remains open, and Mr. Wortley has stayed the proceedings as of May 4, 2015 until the bankruptcy case is fully determined. Mr. Wortley testified that he would have filed the State Court lawsuit regardless of the filing of the bankruptcy or any discovery disputes that occurred during the course of the case. Trial Tr. Vol. V, 1136-37. This Court's decision is limited to the federal bankruptcy proceedings; Mr. Wortley's state court remedies, if any, remain available to him for pursuit.

**M. The Court Approved the Sale of Global Energies' Assets to Chrispus, Vacated the Sale Upon Remand, and Approved the Abandonment of the Assets to Mr. Wortley.**

---

[42] Even after the bankruptcy petition was filed, Mr. Juranitch forwarded opportunities, such as the Poultry Waste or Poultry Buyer opportunity, for Global Energies to Mr. Gates, Mr. Tarrant, and the Chapter 11 Trustee; Mr. Juranitch testified that these were efforts to resurrect Global Energies. Trial Tr. Vol. VI, 1296; Exs. D1-S, P-87. Mr. Juranitch forwarded the Poultry Buyers' request to the Trustee specifically because Global Energies had the technology to satisfy the request, and Plasma Power did not. Trial Tr. Vol. V, 1105.

The Trustee administered the case, brought the assets Mr. Juranitch removed back and elected to file motions to reject the lease agreement for Global Energies' equipment [D.E. 39, Main] and approve bidding procedures to sell Global Energies' assets at auction [D.E. 51, Main]. Trial Tr. Vol. V, 906; Ex. D2-S4. Mr. Wortley testified that he "hoped" the Trustee would "maximize" the value of Global Energies, make Global Energies profitable, sell Global Energies, or get it "operating." Trial Tr. Vol. IV, 808. Mr. Wortley admitted that the Trustee did just as he had hoped. Trial Tr. Vol. IV, 808 ("The Trustee did do that.").

The Trustee testified that Global Energies remained shut down during the entire time that he served as the Chapter 11 trustee. Trial Tr. Vol. V, 907. The Trustee testified that there was "potential," but Global Energies "was an inoperative company that had no funding, had no intellectual property that I was able to monetize at the time." Trial Tr. Vol. V, 920. The Trustee denied being discouraged from trying to realize any value out of the company by Mr. Pugatch's Law Firm or Chrispus, and Mr. Pugatch testified that he discussed the background of the case with the Trustee and his counsel and explained to them that the "goal was to try to bring the company back to life." Trial Tr. Vol. VII, 1435; Vol. V, 921-22. The Trustee had examined Global Energies and "determined that the most reasonable scenario would be to sell the Global Energies' assets in an effort to maximize the value of those assets and to fully satisfy all known creditors."[43] [D.E. 51 at 3, Main]; Trial Tr. Vol. V, 909; Vol. VII, 1437; Ex. D2-S4. Over Mr. Wortley's objection, the Court approved the bidding procedures and set a sale date for November 15, 2010. [D.E. 44, 70, 85, Main].

The Trustee solicited offers to purchase Global Energies' assets from Chrispus and Mr. Wortley simultaneously. Trial Tr. Vol. X, 2155; Vol. V, 909-10; VII, 1437; Ex. D2-S4. Only after the Trustee solicited offers did Chrispus submit a bid, at the direction of "Rob [Roberts] and/or me [Mr. Tarrant]. Trial

---

[43] The Trustee testified and Mr. Wortley agreed that Mr. Wortley had told the Trustee that he wanted time to come up with financing options for Global Energies; however, Mr. Wortley never followed through on producing the financing options. Trial Tr. Vol. IV, 814-15, V, 907-08; VII, 1436; Ex. D2-S4. Although Mr. Wortley had had many conversations with Mr. McCarty to organize a merger with SES or otherwise produce financing opportunities for Global Energies, Mr. Wortley chose not to contact Mr. McCarty. *See* discussion *supra* Section I.C. Unrelated to Mr. Wortley's promise to produce financing options, the Trustee testified that he met with an investment banker multiple times about marketing Global Energies, but the Trustee never entered into a contract with the investment banker. Trial Tr. Vol. V, 919-20.

Tr. Vol. X, 2155; Vol. VII, 1437-38; Ex. D2-S4. Mr. Tarrant, Mr. Roberts, and Chrispus made an offer to purchase the assets because "it was clear that the Trustee needed cash to keep going, and I [Mr. Tarrant] also wanted to give Mr. Wortley his money." Trial Tr. Vol. X, 2156. Mr. Tarrant testified that he did not care about the actual assets because he hoped that "if he [Mr. Wortley] was at least made whole, maybe he would go away and not add us to his litigation list." Trial Tr. Vol. X, 2156.  Although the Trustee solicited offers from both sides, no other party submitted a competing bid by the deadline of November 10, 2010 [D.E. 98 at 5, Main], and Mr. Wortley admitted that he did not make an offer. Trial Tr. Vol. IV, 819; Vol. V, 909, 911; Ex. D2-S4.

After negotiating a higher price than the initial offer of $500,000, the Trustee testified that Chrispus agreed to purchase Global Energies' assets in exchange for $750,000. Trial Tr. Vol. IV, 820; Vol. V, 910. As a part of the deal, Chrispus agreed to subordinate its claim to ensure all other parties (including Mr. Wortley) were paid first, and, if the claims exceeded $750,000, Chrispus agreed to pay off the remainder of the claims. Trial Tr. Vol. IV, 820-21. The Trustee "determined that Chrispus' bid was the highest and best offer presented for the purchase of the Acquired Assets." Ex. D2-S4. Prior to the approval and closing of the sale, the same deal was offered to Mr. Wortley (i.e. Chrispus' fourth and final offer), and Mr. Wortley admitted that he turned down the offer. Trial Tr. Vol. IV, 821-22.

After notice and a hearing, the Court approved the sale of Global Energies' assets to Chrispus for the purchase price of $750,000 (which was negotiated by the Trustee), found that Chrispus "acted in good faith, [was] an arms-length purchaser of the Acquired Assets and shall be entitled to the protections afforded a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code," and overruled Mr. Wortley's objection to the sale.[44] [D.E. 98 at 4, 8, 9, 10, Main]. The Trustee's Report of Sale [D.E. 192, Main] states that "[t]he Trustee received the total purchase price of $750,000 . . . from Chrispus Venture Capital, LLC," and the closing occurred "on or about January 3, 2011." [D.E. 192 at 1, Main]; Trial Tr. Vol. V, 911. "The transfer of the Debtor's assets [from the Trustee to Chrispus] began on January 5, 2011 and was completed

---

[44] By the time the Court approved the sale of Global Energies' assets, the parties had filed the Schedules [D.E. 57, Main], and Mr. Wortley had filed a Supplement to the Schedules [D.E. 76, Main] for the Court and Trustee's review.

on January 7, 2011." *Id.* Out of the $750,000.00 purchase price, the Trustee testified that he was able to pay the entire balance of the administrative expenses and creditor claims, including Mr. Wortley's claim. Trial Tr. Vol. V, 912. The docket indicates that the Sale Order was never appealed and is now a final order.

Pursuant to the Final Order [D.E. 707, Main] from the Eleventh Circuit, the Court vacated the Sale Order [D.E. 98, Main] on January 31, 2017 by granting the Trustee's Expedited Motion to Abandon Certain Assets of the Estate [D.E. 860]. [D.E. 987, Main]. Mr. Tarrant no longer has possession of the assets. Trial Tr. Vol. X, 2177. Pursuant to the Court's Order, the assets "which were the subject of the Sale Order [were] abandoned to the Debtor," and Mr. Wortley was to take possession of the assets, pending further order of the Court. [D.E. 987 at 2, Main]. The Court had no knowledge of whether Mr. Wortley had taken possession of the assets at the time of entry of this Order.

## N. The Trustee Paid Mr. Wortley's First Proof of Claim [1-1] and Only Mr. Wortley's Second Proof of Claim [3-1] for 20 Million Dollars Remains Unpaid.

On December 17, 2010, Mr. Wortley filed his first proof of claim [Claim 1-1] in the amount of $514,778.00 for services performed, money loaned, and other bases. The Trustee and Chrispus filed objections to Mr. Wortley's Claim 1-1 [D.E. 123, 126, Main], and Mr. Wortley filed a Response [D.E. 143, Main]. After an evidentiary hearing, the Court denied Mr. Wortley's *ore tenus* Motion to Amend the Proof of Claim and sustained the objections – allowing Mr. Wortley's claim in the amount of $203,193.57 and disallowing the remainder. [D.E. 219, 266, 396, 422, Main]. Mr. Wortley appealed this decision to the U.S. District Court for the Southern District of Florida (the "District Court") [D.E. 424, Main] and voluntarily dismissed the appeal on February 24, 2012. [D.E. 454, Main; D.E. 9, 11-cv-62749-KAM].

During the pending litigation over Mr. Wortley's Claim, the Court authorized an interim distribution, to which Mr. Wortley agreed, which "[paid] the Unsecured Creditors the full amount of their claims as reflected on the Schedules and . . . all outstanding administrative fees incurred through May 31, 2011." [D.E. 351, Main]. Due to the pending litigation over the allowed amount of Mr. Wortley's claim and Mr. Wortley and Chrispus' agreement with the Trustee to subordinate their claims until all administrative claims were paid in full [D.E. 326 at 3, Main], Mr. Wortley did not receive a distribution at

that time. *Id.* Per the agreement, the Court has since authorized Mr. Wortley's allowed Claim 1-1 to be paid in full in the amount of $203,193.57. [D.E. 987 at 2, Main].

On June 18, 2015, Mr. Wortley filed a second proof of claim [Claim 3-1] in the amount of $20,000,001.00. Claim 3-1 stated that the basis for the claim was "11 U.S.C. § 303(i)(2) – refer to Notice of Filing Proposed Revised Complaint for Relief on Remand [Docket No. 853] for more detail."[45] [Claim 3-1 at 1]. Mr. Wortley asserted that his damages on remand exceeded $20 million. *Id.*; *see supra* note 38 and accompanying text. Chrispus filed an Objection to Mr. Wortley's second proof of claim. [D.E. 994, Main]. The Court denied Chrispus' Objection without prejudice and did not make a determination that Mr. Wortley's Claim 3-1 is "valid or allowed." [D.E. 1002, Main]. The Trustee testified that the only unpaid claim is Mr. Wortley's new claim for $20 million.[46] Trial Tr. Vol. V, 912.

**O. The Court Denied Mr. Wortley's First Motion to Dismiss [D.E. 54, Main].**

On October 7, 2010, Mr. Wortley filed his first Expedited Motion to Dismiss for Bad Faith [D.E. 54, Main] (the "First Motion to Dismiss"). The only parties to that dispute were Mr. Wortley and Chrispus. At the hearing on November 10, 2010, counsel for Mr. Wortley and Chrispus proffered all evidence and stipulated to the admissibility of exhibits. [D.E. 94, 95, Main]. The Court did not hear live testimony from any of the parties, and the Trustee informed the Court of the status of the case. The Court took the matter under advisement and gave counsel time to submit proposed orders. [D.E. 88 at 66-68, Main]. During this time, Mr. Wortley's counsel withdrew [D.E. 90, Main] the First Motion to Dismiss [D.E. 54, Main], and Chrispus' counsel objected to the withdrawal [D.E. 92, Main]. On November 30, 2010, the Court entered an Order Denying Motion to Dismiss Case [D.E. 97, Main], and the docket indicates that this order was never appealed and is now a final order.

**P. The Court Ordered a Directed Verdict Denying Mr. Wortley's Second Motion to Dismiss [D.E. 128, Main].**

---

[45] The Court dismissed Mr. Wortley's Section 303 claim, which is the only purported basis for Claim 3-1. *See* discussion *infra* Section I.S.

[46] The Court has yet to determine whether Mr. Wortley's $20 million claim is allowed and timely.

On March 21, 2011, Mr. Wortley filed his Second Motion to Dismiss [D.E. 128, Main]. At the status conference on May 4, 2011 [D.E. 167, Main], the Court held an evidentiary hearing and heard Chrispus' Motion for Summary Judgment and/or to Quash Joseph G. Wortley's Motion to Dismiss Chapter 11 Case for Bad Faith Based on New and Additional Evidence of Conspiracy and Misrepresentations [D.E. 147, Main] and accompanying objections and responses [D.E. 154, 155, Main]. The Court denied Chrispus' Motion for Summary Judgment [D.E. 205, Main] and set the Second Motion to Dismiss [D.E. 128, Main] for an evidentiary hearing [D.E. 229, 268, 314, Main].

At the one-day evidentiary hearing on September 20, 2011, the Court considered the Second Motion to Dismiss [D.E. 128, Main] and Supplement [D.E. 343, Main]. [D.E. 314, 440 at 216, Main]. The Court heard Mr. Wortley's case in chief, which included live testimony from two witnesses – Mr. Wortley [D.E. 440 at 22, Main] and Mr. James Juranitch [D.E. 440 at 131, Main]. After Mr. Wortley rested his case in chief, Chrispus' counsel moved for a directed verdict under Bankruptcy Rule 7052 [D.E. 440 at 197, Main]. The Court stated the following findings on the record:

> The case was filed as an involuntary petition on July 1, 2010. The operations apparently stopped May 13, 2010, and were never resumed. I do not give credibility to Wortley's allegations of bad faith. He is bound by his actions or inactions on the involuntary petition, the appointment of a trustee and sale. Wortley was represented by counsel. He could have contested the involuntary petition. He could have contested the appointment of a trustee. He knew of the operations of the debtor having ended, if you will, May 13th or 14th, 2010. The state court litigation that commenced in October 2010 shows knowledge and intent. At the trustee's sale of November 15, 2010, Wortley participated, Wortley objected. Wortley did not bid, Wortley did not appeal. The parties are bound by the final order of the Court on the sale. There is no evidence or proof of bad faith. Everything was known or disclosed to the party. I will grant the motion for directed verdict.

[D.E. 440 at 216-17, Main]. On September 27, 2011, the Court entered the Order Granting Petitioning Creditor Chrispus Venture Capital, LLC's *Ore Tenus* Motion for Judgement on Partial Findings and Order Denying Motion to Dismiss Case [D.E. 399, Main] (the "Order Denying the Second Motion to Dismiss"). The Order Denying the Second Motion to Dismiss [D.E. 399, Main] summarily granted the *ore tenus* motion and denied the Second Motion to Dismiss [D.E. 128, Main] "based on the Court's oral findings and conclusions as stated on the record." [D.E. 399, Main]. Because of the directed verdict, Mr. Pugatch never

42

put on any witness testimony in the case, never put on a case, never made a final argument, and never argued the issues on the merits. Trial Tr. Vol. VII, 1485-86.

On October 4, 2011, Mr. Wortley filed the Notice of Appeal of the Order Denying the Second Motion to Dismiss [D.E. 399, Main], appealing the order to the District Court. [D.E. 404, Main]. On April 26, 2012, the District Court entered a Final Order dismissing the appeal because Mr. Wortley failed to timely file a brief. [D.E. 455, Main; D.E. 19, 11-62747-KMM]. Mr. Wortley appealed the District Court's order dismissing to the Eleventh Circuit, and the Eleventh Circuit also dismissed that appeal on April 26, 2012 because Mr. Wortley "failed to file an appellant's brief and record excerpts within the time fixed by the rules." *Joseph Wortley v. Chrispus Venture Capital, LLC*, 12-11160 (April 26, 2012).

**Q. Mr. Wortley Discovered the "Smoking Gun" Emails through the State Court Case.**

Throughout this case, the parties have engaged in multiple discovery disputes; the most notable of these is Mr. Wortley's accusation that Mr. Chad Pugatch and his Law Firm, Rice Pugatch Robinson & Schiller, P.A., allegedly withheld the "smoking gun" emails. Trial Tr. Vol. Vol. I, 108; VIII, 1689-90. On April 12, 2011, *twenty-two days* after Mr. Wortley filed his Second Motion to Dismiss [D.E. 128, Main], Mr. Wortley executed a subpoena against Chrispus, which requested written communications from Mr. Roberts to multiple other individuals between April 1, 2010 and July 31, 2010. [D.E. 169 at 9-11, Main]. On April 21, 2011, *thirty-one days* after Mr. Wortley filed his Second Motion to Dismiss [D.E. 128, Main], Mr. Wortley served the April 21, 2011 Request for Production of Documents upon Chrispus Venture Capital, LLC, which requested email communications from Mr. Tarrant to multiple individuals since January 1, 2010. [D.E. 156 at 9-12, Main]. The timing of these discovery requests indicated to the Court that Mr. Wortley prematurely filed the Second Motion to Dismiss [D.E. 128, Main] prior to obtaining the new evidence that he alleged he already possessed.

Chrispus moved for a protective order from these discovery requests because, although the requests themselves were not identical to the state court requests, the documents to be produced would be the same, and Chrispus wanted to produce them only once, in a single court. [D.E. 156, 169, Main]; Trial Tr. Vol. VII, 1475-76, VIII, 1763. On May 12, 2011 and June 27, 2011, the Court entered two protective orders

[D.E. 211, 327, Main], which Mr. Wortley never appealed and are now final orders. Trial Tr. Vol. VII, 1475-76. Because discovery relating to the aforementioned requests was foreclosed in the bankruptcy court, the following discovery dispute proceeded in the state court.

During the relevant time in the state court, Mr. Thomas U. Graner represented Mr. Wortley until approximately August 2011 when Mr. Wortley fired Mr. Graner and hired Mr. Raymond "Ray" Kramer.[47] Mr. Pugatch's Law Firm represented Mr. Tarrant in the state court action, and Mr. Steven Lippman, Mr. George Zinkler, and Mr. Pugatch were the attorneys assigned to the case. Trial Tr. Vol. VII, 1468. Mr. Lippman was the partner assigned to the state court case, and Mr. Pugatch was the partner in the bankruptcy case.[48] Trial Tr. Vol. VII, 1495-96, 1468-69. Mr. Zinkler was the associate who assisted in both the state and bankruptcy court cases. Trial Tr. Vol. VII, 1496.

In the state court case, Mr. Wortley served a first request for production upon Mr. Tarrant, and on April 29, 2011, Mr. Tarrant responded to the request and listed the "smoking gun" emails on the privilege log. Ex. D2-D3, D2-U3 at 3; Trial Tr. Vol. VIII, 1682, 1695, 1702. On March 22, 2011, Mr. Wortley amended his state court complaint to add additional parties and served a second request to produce upon Mr. Tarrant. Ex. D2-H3.  Mr. Lippman and Mr. Zinkler testified that the parties agreed to a procedure for producing the documents; they agreed to make the hard copies of the documents available to opposing counsel for inspection and copying, rather than delivering the documents to opposing counsel. Trial Tr. Vol. VII, 1502, 1514, 1477; Vol. VIII, 1698-99. Mr. Zinkler, as counsel to Mr. Tarrant, requested additional time to comply with the request, and Mr. Wortley's attorney, Mr. Graner, agreed to an extension through June 13, 2011. Trial Tr. Vol. VIII, 1700. Mr. Zinkler responded by the deadline of June 13, 2011. *Id.*; Ex. D2-I4.

---

[47] When Mr. Kramer testified as a rebuttal witness, Mr. Kramer testified that Mr. Wortley paid him for his time to testify at the first day of trial, when Mr. Wortley called him as a witness in his case in chief. Trial Tr. Vol. IX, 2049-50. The Court notes that Mr. Kramer appeared as a fact witness, not an expert witness. Further, Mr. Kramer testified that he did not have access to his emails relating to this case because they were archived and the process to recover them had not been undertaken. Trial Tr. Vol. IX, 2057.
[48] Mr. Lippman and Mr. Pugatch testified that Mr. Lippman kept Mr. Pugatch apprised of the events in the state court case and involved Mr. Pugatch in some of the decision-making as needed. Trial Tr. Vol. VII, 1495-96, 1469.

For the second request for production, Mr. Lippman was the primary attorney responsible for production, and Mr. Lippman and Mr. Zinkler together reviewed all of the responsive documents, which were kept in Mr. Lippman's office. Trial Tr. Vol. VIII, 1701, 1713. The documents were divided into three categories: yes, no, and maybe. The "smoking gun" emails were placed in the maybe category because Mr. Lippman and Mr. Zinkler were unsure whether they should be produced due to a possible clam for privilege. Trial Tr. Vol. VIII, 1702. Because they were uncertain, Mr. Lippman and Mr. Zinkler consulted with Mr. Pugatch about whether to produce the "smoking gun" emails in June 2011. Trial Tr. Vol. VIII, 1703. Mr. Pugatch directed them to produce the "smoking gun" emails, and Mr. Lippman agreed with the decision. Trial Tr. Vol. VIII, 1703; Vol. VII, 1517-18, 1478-79. Mr. Lippman represented to the state court that the documents were produced, according to the procedure agreed to by the parties, in June of 2011. Trial Tr. Vol. VIII, 1737-38, 1746; Vol. VII, 1522-23; Ex. D2-D5 at 2.

Despite production of the documents in June of 2011, Mr. Wortley's counsel failed to inspect, copy, or pick up the three boxes of documents, including the "smoking gun" emails until nine months later in March 2012. Trial Tr. Vol. I, 78-79, 126, Vol. VII, 1480-81, Vol. VII, 1516, 1520-21, 1766, 1769, 1774. During this time, Mr. Zinkler and Mr. Lippman testified that there were no changes made to the documents and the documents picked up in March 2012 were the same as the ones made available as of the September 2 email. Trial Tr. Vol. VIII, 1712; Vol. VII, 1516, 1521. After receiving the documents in March of 2012, Mr. Wortley discovered the "smoking gun" emails within two days. Trial Tr. Vol. I, 120.

Defendants Mr. Pugatch and the Law Firm presented ample evidence of the efforts to remind Mr. Wortley's counsel and multiple opportunities of which Mr. Wortley's counsel failed to avail themselves. First, the state court set a special hearing on Mr. Wortley's motion to compel for September 9, 2011; however, Mr. Kramer and his Law Firm cancelled this hearing, and the parties agreed to resolve the discovery issues without the intervention of the state court. Trial Tr. Vol. I, 99-100, 102-03; Vol. VIII, 1705-07; Vol. VII, 1505; Vol. VIII, 1774; Vol. IX, 2045. Second, Mr. Lippman emailed Mr. Wortley's new counsel, Mr. Kramer and his Law Firm, to advise them of the documents and let them know the documents were ready for pickup a total of four times – September 2011, November 2011, December 2011, and March

2012. Trial Tr. Vol. I, 118; Vol. VIII, 1707, 1748-49; Vol. VII, 1503, 1508, 1510-12; Ex. D2-N4, D2-U4, D2-V4, D2-W4, D2-X4, D2-Y4, D2-A5, D2-B5, D2-C5. Mr. Lippman testified that he emailed Mr. Kramer and Mr. Kramer testified that he received the September 2, 2011 email; Mr. Lippman sent this email as a courtesy because Mr. Wortley had recently retained Mr. Kramer. Trial Tr. Vol. I, 74; Vol. VII, 1481; Vol. VIII, 1732, 1774.

The Court has also reviewed multiple excuses from Mr. Wortley's counsel for why they did not obtain the documents, including the "smoking gun" emails until March 2012. First, Mr. Wortley has had multiple attorneys throughout the litigation in bankruptcy and state court.[49] During the relevant time of the discovery dispute, Mr. Wortley substituted Mr. Kramer for Mr. Graner's counsel in August of 2011, which caused understandable confusion about the status of discovery. Trial Tr. Vol. V, 81, 88, 89-91. Second, Mr. Wortley's prior counsel, Mr. Graner, represented in state court that they were requesting these documents for the purpose of the bankruptcy proceeding. Mr. Wortley's new counsel, Mr. Kramer was not involved in the underlying bankruptcy;[50] thus, Mr. Kramer was unaware of the bankruptcy protective orders, the bankruptcy proceedings and bankruptcy trial set for the end of September 2011, and that Mr. Wortley's prior counsel had requested the documents for use at the September 2011 bankruptcy trial. Trial Tr. Vol. I, 124-25; Vol. VIII, 1706-07; Vol. IX, 2052, 2053. Mr. Kramer testified that, if he had known this information, he would not have agreed to cancel the September 9th hearing on the motion to compel. Trial Tr. Vol. IX, 2052. Although the documents had been available since June 2011, Mr. Kramer filed another motion to compel, which the state court noticed for hearing in February 2012; thus, Mr. Kramer believed that he was "diligent in trying to get the documents," even though he made no effort to reset this motion for an earlier date or otherwise collect the documents. Trial Tr. Vol. I, 81-86; Vol. IX, 2059.

---

[49] According to court records maintained through CM/ECF, Mr. Wortley has had twenty attorneys in the bankruptcy case – fourteen attorneys in the main case and six attorneys in the adversary proceeding. The Court refrained from listing the attorneys in this Order; however, the Court found all of Mr. Wortley's counsel to be highly qualified and competent attorneys.

[50] Mr. Kramer was involved in the state court proceedings and some of the bankruptcy appeals, but he never represented Mr. Wortley in the underlying bankruptcy case. Trial Tr. Vol. I, 124-25.

Third, Mr. Kramer, Mr. Zinkler, Mr. Lippman, and Ms. Patricia Metlika (Mr. Kramer's paralegal) testified about a miscommunication between September and November 2011 regarding whether the documents were available for pickup, the amount of the documents (i.e. 1 banker box versus 3 banker boxes of documents), and the status of cataloguing or BATES stamping the documents.[51] Trial Tr. Vol. I, 74, 76, 77, 78, 98-99, 101-02, 109, 120, 123-24; VIII, 1709-11, 1738, 1751-52; Vol. VII, 1515; Vol. IX, 2005-07, 2009, 2012-13, 2014-15, 2018, 2028; Ex. D2-A5. All four parties testified credibly; however, the accounts from these parties do not align, which is understandable because the Court heard their testimony approximately six years after the events took place. The Court found that a simple miscommunication regarding the documents occurred between the parties because Mr. Kramer testified that he never spoke directly with Mr. Lippman or Mr. Zinkler about the documents, and all communications were passed through Mr. Lippman's paralegal, Ms. Metlika. Trial Tr. Vol. I, 101-02, 123-24, 129-30; Vol. VIII, 1731, 1737; Vol. IX, 2044. The Court found that there was no bad faith because this miscommunication was, at the very most, merely reckless on the part of all of the attorneys involved.

**R. On Remand, the Court Granted Mr. Wortley's Motion for Rehearing [D.E. 465, Main].**

On April 23, 2012, three days before the Eleventh Circuit dismissed the appeal of the Order Denying the Second Motion to Dismiss [D.E. 399, Main], Mr. Wortley filed the Motion for Rehearing Due to Newly-Discovered Evidence (concealed by Chrispus) Produced in an Unrelated Case Affirmatively Demonstrating Bad Faith and Conspiracy to Accomplish Bad Faith Involuntary Filing [D.E. 465, Main] (the "Motion for Rehearing") of the Order Denying the Second Motion to Dismiss [D.E. 399, Main]. The Motion for Rehearing [D.E. 465, Main] only requested a rehearing of the Second Motion to Dismiss [D.E. 128, Main] based on Fed. R. Civ. P. 60(b)(2) and (3).

The Court heard the Motion for Rehearing [D.E. 465, Main] and the Response [D.E. 477, Main] on May 24, 2012 [D.E. 466, Main]. On May 29, 2012, the Court entered the Order Denying Interested

---

[51] Mr. Kramer testified that there was no agreement between the parties to BATES stamp the documents. Trial Tr. Vol. I, 95.

Party, Joseph Wortley's Motion for Rehearing Due to Newly-Discovered Evidence (Concealed by Chrispus) Produced in an Unrelated Case Affirmatively Demonstrating Bad Faith and Conspiracy to Accomplish Bad Faith Involuntary Filing [D.E. 482, Main] (the "Order Denying Motion for Rehearing") "for all the reasons stated on the record."

On June 8, 2012, Mr. Wortley filed a Notice of Appeal [D.E. 486, Main] of the Order Denying Motion for Rehearing [D.E. 482, Main] to the District Court. The District Court entered a Final Order [D.E. 615, Main] affirming the Court's Order Denying Motion for Rehearing [D.E. 482, Main]. D.E. 615, Main; *Wortley v. Chrispus Venture Capital, LLC (In re Glob. Energies, LLC)*, No. 12-61483-Civ, 2013 U.S. Dist. LEXIS 196473 (S.D. Fla. Feb. 11, 2013). The District Court denied Mr. Wortley's motion for reconsideration of that Final Order. [D.E. 30, 12-61483-KMW]. Thus, Mr. Wortley appealed the District Court's Final Order [D.E. 615, Main] to the Eleventh Circuit. [D.E. 31, 12-61483-KMW]. The Eleventh Circuit ultimately issued a Final Order, reversed the District Court's Final Order, and remanded the case to this Court with a Mandate. D.E. 707, Main; *Wortley v. Chrispus Venture Capital, LLC (In re Glob. Energies, LLC)*, 763 F.3d 1341 (11th Cir. 2014). Per the Eleventh Circuit's instruction in the Mandate [D.E. 707, Main], the Court vacated the Order Denying Motion for Rehearing [D.E. 482, Main], granted Mr. Wortley's Motion for Rehearing [D.E. 465], and set the Second Motion to Dismiss [D.E. 128, Main] for rehearing. [D.E. 1046, Main].[52]

**S. Mr. Wortley Commenced the Adversary Proceeding to Pursue Damages Claims and Bring All Parties Under the Jurisdiction of this Court.**

---

[52] The Court acknowledges that the Order Vacating the Order Denying Motion for Rehearing [D.E. 1046] was long overdue. However, the Court would also note, "the parties [had] been proceeding in the main case and the adversary case as if [such action] had been granted." [D.E. 1046 at 2]. Additionally, the Court took special steps to minimize any potentially harmful effects of the procedural error by "providing reasonable opportunity for the parties to supplement the record with additional evidence to support their claims, if necessary." *Id.* The parties took every advantage of this extra leeway by filing multiple documents and other supporting evidence, admitting additional evidence excluded from the original exhibit registers, and taking a full eleven days to present evidence and testimony at trial. The parties failed to use an additional day, October 27, 2017, that the Court set aside for trial; the parties rested their cases and insisted that the additional day was unnecessary. Further, the Court recognized that Mr. Wortley was proceeding *pro se*, and the Court made "allowances for Mr. Wortley because he's appearing *pro se.*" Trial Tr. Vol III, 618; IV, 793. Indeed, the Court bent over backwards to permit Mr. Wortley to present his case in the manner that he wished, within the confines of the Rules.

Upon remand, the Court issued a Scheduling Order [D.E. 719, Main] outlining the Court's plan for setting status conferences for briefing on the issues, requiring the parties to attend mediation, and requiring Mr. Wortley to file a pleading "stating the relief requested, including any request for sanctions, the basis for such relief, and any claimed damages or remedies." [D.E. 719 at 1, Main]. On December 12, 2014, in response to the Court's Scheduling Order [D.E. 719, Main], Mr. Wortley filed a Statement of Relief Sought as Awarded by the Eleventh Circuit Judgment of August 15, 2014 [D.E. 724, Main] (Mr. Wortley's "Statement of Relief Sought"). In this Statement of Relief Sought, Mr. Wortley provided an itemized list of requests for "sanctions awards and damages . . . to be awarded to Wortley because the Eleventh Circuit has explicitly awarded those sanctions awards and damages." [D.E. 724 at 4, Main]. The itemized list included profits realized (including the value of Global Energies, lost profits, future value of Global Energies, unjust enrichment, etc.) by Chrispus, Tarrant, Juranitch, Pugatch, and Law Firm; professional fees received by Pugatch and Law Firm; attorney's fees and costs from the bankruptcy, state court, and appellate litigation; and punitive damages. *Id.* at 4-6.

Over the next four months, the parties engaged in a frenzy of discovery and motion practice. This litigation culminated in Mr. Wortley filing a Revised Statement of Relief [D.E. 821, Main] and the Motion for Entry of an Order Pursuant to Bankruptcy Code §§ 105(a) and 503(b)(3)(B) Granting Leave, Standing, and Authority to Commence, Prosecute, and, if appropriate, Settle Certain Causes of Action on Behalf of the Global Energies' Estate [D.E. 819, Main] (the "Motion for Adversary Proceeding"). Mr. Wortley wanted to establish derivative standing and commence an adversary proceeding by filing a complaint seeking avoidance of the sale, damages from the sale, dismissal of the Petition, and damages under 11 U.S.C. § 303(i). *Id.* The Revised Statement of Relief explained that the complaint and adversary proceeding would define all issues to be briefed and argued by the parties, resolve the dispute as to whether all parties were subject to the jurisdiction of the Court, and consolidate litigation.[53] All parties, including the Trustee,

---

[53] The Revised Statement of Relief promised that Mr. Wortley would stay the state court proceeding, which was ongoing, and abate all discovery practice in the main case in favor of transferring such litigation to the adversary proceeding. [D.E. 821, Main].

filed responses to the Motion for Adversary Proceeding [D.E. 846, 847, 848, Main], and Mr. Wortley filed an omnibus reply [D.E. 853, Main] and a revised complaint [D.E. 853, Main]. The Court entered the Order Granting in Part the Motion for Entry of an Order Granting Leave, Standing, and Authority to Prosecute Actions on Behalf of the Estate and Denying Revised Statement of Relief Sought on Remand and Motion for Entry of Case Management Order [D.E. 881, Main] (the "Order Granting in Part Motion for Adversary Proceeding").[54] The Court allowed Mr. Wortley to commence the adversary proceeding; however, the Court refused Mr. Wortley's request for derivative standing to bring a § 303 action. [D.E. 881, Main].[55]

On July 10, 2015, Mr. Wortley commenced the adversary proceeding by filing the Complaint against Mr. Tarrant, Mr. Juranitch, Chrispus, Mr. Pugatch, the Law Firm, and Plasma Power (the "Defendants"). [D.E. 1, Adv. Proc.; D.E. 894, Main]. This adversary proceeding brought all of these parties under the jurisdiction of the Court. Mr. Wortley's Complaint alleged fourteen counts [D.E. 1 at 3-6], and Defendants' Answers asserted twenty-eight affirmative defenses [D.E. 95, 99, 97, 112, Adv. Proc.]. On December 4, 2015, the Court entered an Order Granting and Denying In Part Defendants' Motions to Dismiss and Denying the Motion to Amend [D.E. 85, Adv. Proc.], which dismissed Counts V (Dismissal of Involuntary Petition), VI (Recovery of Damages in Connection with Dismissal of Involuntary Petition), VII (Payment of Mr. Wortley's Allowed Claim), IX (Transfer of Defendants' Membership Interests in, and Accounting and Disgorgement of Defendants' Additional Profits from Plasma Power), XI (Reimbursement of Plaintiffs' Attorneys Fees and Costs), XIII (Attachment of Defendants' Property), and XIV (Amendment of Pleadings). [D.E. 85 at 10, Adv. Proc.]. On January 31, 2017, the Court entered an Order Granting Motion to Abandon [D.E. 987, Main], which resolved Counts I (Avoidance of Sale), II (Recovery of Avoided Sale), III (Preservation of Transfer), IV (Equitable Subordination of Defendants' Interests in Global Energies), and VII (Payment of Mr. Wortley's Allowed Claim). On February 16, 2017, the Court entered the Order

---

[54] Mr. Wortley appealed the Order Granting in Part Motion for Adversary Proceeding [D.E. 881, Main] by filing a Notice of Appeal [D.E. 888, Main], and the District Court dismissed that appeal. [D.E. 956, Main; D.E. 17, 15-61413-WJZ].
[55] The Court's dismissal of Mr. Wortley's Section 303 Claim eliminated Mr. Wortley's basis for his Claim 3-1. *See* discussion *supra* Section I.N.

Granting and Denying In Part Plaintiff's Motion to Strike [D.E. 181, Adv. Proc.], which allowed only Chrispus, Plasma Power, and Tarrant's First and Fifth Affirmative Defenses; Mr. Juranitch's Third and Fourth Affirmative Defenses; and Mr. Pugatch and the Law Firm's First, Ninth, and Twelfth Affirmative Defenses. The Court struck all other affirmative defenses. *Id.*

On May 23, 2017, the Court entered the Order Granting Plaintiff's Motion for Leave to File an Amended Adversary Complaint [D.E. 280, Adv. Proc.]. Plaintiff's Amended Complaint included eight counts: Count I – Avoidance of Sale (against Chrispus pursuant to 11 U.S.C. § 549(a)); Count II – Recovery of Avoided Sale (against Chrispus pursuant to 11 U.S.C. § 550(a)); Count III – Preservation of Transfer (pursuant to 11 U.S.C. § 551); Count IV – Equitable Subordination of Defendants' Interests in Global Energies (against Tarrant, Juranitch, and Chrispus pursuant to 11 U.S.C. § 510(c)(1)); Count V – Equitable Disallowance of the Chrispus Claim (against Chrispus); Count VI – Accounting and Disgorgement of Defendants' Legal Fees (against Pugatch and Rice Pugatch Robinson Schiller, PA); Count VII – Reimbursement of Plaintiff's Excess Costs, Expenses, and Attorney's Fees (against Pugatch and RPRS pursuant to 28 U.S.C. § 1927); Count VIII – Enforcement of Mandate (against Tarrant, Chrispus, Juranitch, and Pugatch pursuant to the Mandate). [D.E. 232-1, Adv. Proc.]. Counts I, II, III, and IV of the Amended Complaint reiterate counts from the original Complaint that the Court's Order Granting Motion to Abandon [D.E. 987, Main] resolved. Defendants filed answers to the Amended Complaint, which incorporated the remaining affirmative defenses to the original complaint. [D.E. 327, 328, 330, Adv. Proc.]. Thus, at trial, the Court considered the following remaining issues:

1. Four counts of the Amended Complaint [D.E. 232-1]: Count V – Equitable Disallowance of the Chrispus Claim (against Chrispus); Count VI – Accounting and Disgorgement of Defendants' Legal Fees (against Pugatch and RPRS); Count VII – Reimbursement of Plaintiff's Excess Costs, Expenses, and Attorney's Fees (against Pugatch and RPRS pursuant to 28 U.S.C. § 1927); Count VIII – Enforcement of Mandate (against Tarrant, Chrispus, Juranitch, and Pugatch pursuant to the Mandate).

2. Defendants' affirmative defenses; and

3. The Second Motion to Dismiss [D.E. 128, Main].[56]

**T. The Evidence Revealed Mr. Wortley was the Only Party to Benefit from the Bankruptcy.**

Mr. Wortley claimed that his damages on remand exceeded $20 million [Claim 3-1 at 1]; however, the evidence presented to this Court revealed that Mr. Wortley did not sustain any damages and was, in fact, the only party to benefit from the filing of the bankruptcy. Although the Court heard ample expert testimony from Mr. Steven Davis and Mr. Charles Throckmorton concerning Mr. Wortley's abundant attorney's fees, Mr. Wortley failed to provide any evidence of his damages from either the filing of the bankruptcy or any alleged discovery misconduct. Mr. Wortley received a benefit from the filing of the bankruptcy; the Trustee paid Mr. Wortley's allowed claim in full from the funds received by Mr. Tarrant's purchase of the assets, while Chrispus' claim remains subordinated and outstanding. [D.E. 987 at 2, Main]; *see* discussion *supra* Section I.N. This Court has determined that the value of Global Energies at the time of filing the bankruptcy was zero; thus, it is unlikely that Mr. Wortley would have received payment on his note, if the company had remained outside of the bankruptcy system. Further, the decision of this Court is limited to the bankruptcy proceeding, so Mr. Wortley may still pursue any available state court remedies.

**U. The Court Determined the Credibility of the Parties.**

The Supreme Court of the United States has explained, "The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S. Ct. 1504, 1512 (1985) (holding that "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."). The Court heard testimony from Mr. Wortley, Mr. Tarrant, and Mr. Juranitch, which resulted in three facially plausible versions of the same story regarding

---

[56] Mr. Wortley's Complaint and Amended Complaint included a request for jury trial; however, the parties entered an Agreed Order Granting Defendants' Motion to Strike Jury Trial Demand [D.E. 106, Adv. Proc.].

the breakup of Global Energies. Thus, the Court relied upon determinations of the credibility of these three parties when making the findings of fact above and determining which version of the story was more credible. For the reasons explained below, this Court found the testimony of Mr. Tarrant and Mr. Juranitch credible and Mr. Wortley's testimony lacked any and all credibility.

**1. Mr. Wortley Lacks Credibility.**

Mr. Wortley is not a credible witness because his testimony was inconsistent, non-responsive, self-serving, confusing, and argumentative. First, Mr. Wortley gave inconsistent statements throughout the trial. Trial Tr. Vol. VI, 1393 (Mr. Wortley stated that Mr. Juranitch was not locked out of the building; however, Mr. Wortley admitted that "it [Mr. Juranitch's key to the building] did not work because I [Mr. Wortley] changed the locks . . ."). For example, Mr. Wortley testified that "Mr. Juranitch removed Global's assets in the middle of the night, and [] Global Energies never received compensation for those assets." Trial Tr. Vol. V, 1050. Mr. Wortley further stated, "It's never been proven in seven years, that there was any compensation paid to Global Energies for any of the assets that were taken from the 637 Jim Moran Boulevard." Trial Tr. Vol. V, 1050. However, mere moments later, Mr. Wortley admitted that those very assets were returned to the trustee and sold, and the money received in exchange from Mr. Tarrant was used to pay the claims, including his own. Trial Tr. Vol. V, 1051-52. Mr. Wortley's inconsistent, and often absurd, statements throughout trial multiplied the proceedings and caused unnecessary controversy as to facts that could have been stipulated to by the parties.

In addition to inconsistent statements, Mr. Wortley exuded an argumentative demeanor throughout the trial. The Court had to instruct Mr. Wortley to refrain from argumentative behavior when questioning witnesses and answering questions from opposing counsel. Trial Tr. Vol. X, 2339. Mr. Wortley argued with witnesses, talked over their answers, and cut off their responses. Trial Tr. Vol. X, 2183-2187, 2286 (Mr. Wortley argued with the witness about their interactions with newspaper outlets concerning coverage of this case.); Vol. VIII, 1788, 1876 (Mr. Wortley argued multiple times with Mr. Pugatch and stated "I think what you're saying is ridiculous"). On several occasions, Mr. Wortley gave glib, non-responsive answers, rather than straightforwardly answering opposing counsels' questions. Trial Tr. Vol. VI, 1211 ("You're

ridiculous. You are ridiculous."); Vol. VI, 1188 ("We are a capitalist society."); Vol. V, 1122 ("Lazarus."). The Court was forced to instruct Mr. Wortley to refrain from throwing documents at a witness. Trial Tr. Vol. X, 2252 (When Mr. Wortley threw documents at Mr. Tarrant, Mr. Tarrant responded, "Don't throw that at me," and the Court instructed, "Please, don't throw the document, Mr. Wortley.").

The Court found that Mr. Wortley's testimony and his lines of questioning revealed personal motive and animus for pursuing this litigation, which damaged Mr. Wortley's credibility. *See* discussion *supra* Section I.A. First, Mr. Wortley placed a significant amount of weight on the friendships between the parties. Trial Tr. Vol. IV, 735-37, 738-40, 745-46. Second, Mr. Wortley stated that he had forwarded the 11th Circuit Opinion to a news reporter in Mr. Tarrant's hometown in Vermont, and the Court found that Mr. Wortley intended to disparage Mr. Tarrant's reputation in his hometown where his family resides. Trial Tr. Vol. X, 2183-2187. Third, Mr. Wortley testified that he created a website, which summarized Mr. Wortley's depiction of the bankruptcy events, for the explicit purpose of directing friends and associates there when they asked for Mr. Wortley's side of the story. Trial Tr. Vol. IV, 728. Finally, Mr. Wortley derogatorily referred to Mr. Juranitch multiple times as merely an employee of Global Energies, despite Mr. Juranitch undisputedly being a managing member of the company.[57] Trial Tr. Vol. V, 1022-24, 1045, 1053 ("He [Mr. Juranitch] was an employee of the company."). This fact alone demonstrates a personal animus; however, Mr. Wortley further demeaned Mr. Juranitch when Mr. Wortley testified consistently that he believed the employees were property or assets of Global Energies. Trial Tr. Vol. VI, 1161, 1164 (Mr. Wortley testified that the employees were not returned to the Trustee; he stated that Global Energies owned the employees; and he stated that he knew "that a company has legal ownership of . . . its employees."). The testimony of a person who believes people are property cannot be credible; thus, the Court gave no weight to Mr. Wortley's testimony.

---

[57] Mr. Juranitch testified that, in addition to his responsibilities as a managing member of Global Energies, Mr. Wortley "used [him] as a lackey." Trial Tr. Vol. VI 1264. Mr. Wortley asked Mr. Juranitch to work on personal projects for him, including "retitl[ing] his jet ski, fix[ing] his boat, set[ting] up a service program for his airplane," and other miscellaneous tasks. *Id.* Mr. Juranitch stated that this made him feel "really annoyed" and described it as "very distractive, very upsetting." *Id.*

Even more compelling, counsel for Chrispus adduced evidence on cross-examination of a specific instance of Mr. Wortley's character for untruthfulness – a finding from the United States Court of Appeal for the First Circuit (the "First Circuit") that Mr. Wortley committed civil fraud.[58] Trial Tr. Vol. XI, 2364-73; *see* Fed. R. Evid. 608(b).  Trial Tr. Vol. XI, 2365; Ex. D1-Z11; *Wortley v. Camplin*, 333 F.3d 284, 291 (1st Cir. 2003). At the trial level, "[t]he jury found that Wortley committed federal securities law fraud and awarded Camplin $265,000 in damages." *Id.* On appeal, Mr. Wortley argued that "there was insufficient evidence that he acted with the requisite state of mind to meet the scienter requirement." *Id.* at 294. The First Circuit rejected Mr. Wortley's argument and affirmed the jury finding that Mr. Wortley provided untruthful testimony because "[o]nce the jury found, as it permissibly did on the evidence, that Wortley had effectively promised to indemnify Camplin, it was easy to conclude from his own testimony that he never intended to keep the promise." *Id.* at 295, 299. This Court found this evidence of prior untruthful testimony and civil fraud to be the most compelling evidence of Mr. Wortley's lack of credibility.

### 2. Mr. Tarrant Testified Credibly.

Mr. Tarrant answered the questions posed to him forthrightly. The Court found that Mr. Tarrant was a credible witness and gave substantial weight to his testimony.

### 3. Mr. Juranitch Testified Credibly.

Mr. Juranitch answered the questions posed to him forthrightly. The Court found that Mr. Tarrant was a credible witness and gave substantial weight to his testimony.

### 4. Mr. Pugatch Testified Credibly.

---

[58] Regarding the First Circuit opinion, Mr. Wortley lied on the record about opposing counsel, Mr. Goldberg's, statement that he would explore the First Circuit opinion and not the Trafford case on cross. After Mr. Pugatch vouched for Mr. Goldberg's honesty, Mr. Wortley admitted to telling a half-truth when he stated, "That is actually somewhat correct." Trial Tr. Vol. XI, 2369-70.

Mr. Pugatch answered the questions posed to him forthrightly. The Court found that Mr. Pugatch was a credible witness and gave substantial weight to his testimony.

## II. CONCLUSIONS OF LAW

"A trial court, upon receiving the mandate of an appellate court, may not alter, amend, or examine the mandate, or give any further relief or review, but must enter an order in strict compliance with the mandate." *Piambino v. Bailey*, 757 F.2d 1112, 1119 (11th Cir. 1985) (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S. Ct. 291, 293 (1895)). "Although the trial court is free to address, as a matter of first impression, those issues not disposed of on appeal, it is bound to follow the appellate court's holdings, both expressed and implied." *Id.* (internal citations omitted). This Court appreciates the ramifications for a trial court that "fails to fully implement the mandate," and, in such a case, the legal system permits "the aggrieved party [to] apply to the appellate court for enforcement, by petitioning for a writ of mandamus." *Id.* at 1120; *see Winn-Dixie Stores, Inc. v. Dolgencorp, LLC,* No. 15-12990, 2018 U.S. App. LEXIS 2325, *12-28 (11th Cir. Jan. 31, 2018).

The mandate rule is a "specific application of the 'law of the case' doctrine," which means the mandate rule is subject to the same limitations as the "law of the case" doctrine. *Piambino*, 757 F.2d at 1120 (citing *Greater Bos. Television Corp. v. FCC*, 463 F.2d 268, 279 (D.C. Cir. 1971); *Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 348 (D.C. Cir. 1977)) ("The law of the case doctrine is not an 'inexorable command'"). Because the mandate rule is subject to limitations, the "mandate rule is not absolute." *I.T.N. Consolidators, Inc. v. N. Marine Underwriters Ltd.*, 699 F. App'x 880, 883 (11th Cir. 2017). The trial court shall adhere to the mandate rule, unless the trial court discovers (1) new evidence, (2) "an intervening change in the controlling law dictat[ing] a different result," or (3) "the appellate decision is clearly erroneous and, if implemented, would work a manifest injustice." *Piambino*, 757 F.3d at 1120 (citing *Westbrook v. Zant*, 743 F.2d 764, 768-69 (11th Cir. 1984)); *Baumer v. United States*, 685 F.2d 1318, 1320 (11th Cir. 1982)).

When the trial court is presented with new evidence on remand, the new evidence must be "substantially different" to justify a deviation from the mandate rule. *Ash v. Tyson Foods, Inc.*, 664 F.3d

883, 891 (11th Cir. 2011) (citing *Friedman v. Mkt. St. Mortg. Corp.*, 520 F.3d 1289, 1295 (11th Cir. 2008));

*United States v. Robinson*, 690 F.2d 869, 873 (11th Cir. 1982). "New" and "substantially different"

evidence exists when the proceedings on remand included "the testimony of a number of witnesses who

had not testified at the first trial." [59]  *Ash*, 664 F.3d at 892. A deviation from the mandate rule may also be

justified when the trial court makes "more detailed findings of fact" than the original findings. *Robinson*,

690 F.2d at 873.

 In the instant case, the Eleventh Circuit reversed and remanded with instructions and issued the

Mandate to this Court. The Mandate stated as follows:

> On remand, the bankruptcy court shall grant Wortley's Rule 60(b)(2) motion and vacate its order approving the sale of Global's assets to Chrispus. This should be without prejudice to any innocent third parties, whose rights and interests are derived and depend upon the sale. The bankruptcy court then shall conduct any hearings necessary in the exercise of all its powers at law or in equity and issue appropriate orders or writs, including without limitation orders requiring an accounting and disgorgement, orders imposing sanctions, writs of garnishment and attachment, and the entry of judgments to ensure that Chrispus, Juranitch, Tarrant, and Pugatch do not profit from their misconduct and abuse of the bankruptcy process. The bankruptcy court shall vacate the sanctions imposed upon Wortley and ensure that he is fully compensated for any and all damages, including awarding Wortley attorneys' fees and costs. The only reason that this court does not impose any of these remedies is that Chrispus, Juranitch, Tarrant, and Pugatch have not had an appropriate hearing, which will be conducted before the bankruptcy court.

*In re Glob. Energies, LLC*, 763 F.3d at 1350.

 In compliance with the Mandate, the Court vacated the Sale Order [D.E. 98, Main], which did not

affect any "innocent third parties."[60] D.E. 987, Main; *In re Glob. Energies, LLC*, 763 F.3d at 1350. Second,

the Court granted Mr. Wortley's Rule 60(b)(2) motion,[61] which vacated the Order Denying Motion for

Rehearing [D.E. 482, Main]. [D.E. 1046, Main]. By granting the Rule 60(b)(2) motion, the Court granted

Mr. Wortley's request for rehearing of the Second Motion to Dismiss. *Id.* The Court refrained from

---

[59] Even if the appellate court's mandate does not require the trial court to entertain an evidentiary hearing, the trial court has the discretion to hold such a hearing, especially when "facts are bitterly contested and credibility determinations must be made." *Grigsby & Assocs. v. M Sec. Inv.*, 635 F. App'x 728, 735 (11th Cir. 2015) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312-13 (11th Cir. 1998)).
[60] Chrispus, as the purchaser, had not sold the assets to any third parties, allowing Chrispus to return the assets to the custody of the Trustee without impacting any other party. The Trustee subsequently abandoned the assets to Mr. Wortley. *See* discussion *supra* Section I.L.
[61] The Court recognizes its error in not granting the Rule 60(b)(2) motion immediately and has taken appropriate steps to rectify this procedural error. *See supra* note 52 and accompanying text.

immediately granting the Second Motion to Dismiss and dismissing the bankruptcy case without an appropriate hearing for three reasons:

> 1) Mr. Wortley's Rule 60(b)(2) motion did not request that relief [D.E. 482, Main];

> 2) The Court's reading of the Mandate revealed that the Eleventh Circuit did not hold (expressly or impliedly) that this Court must grant the Second Motion to Dismiss; and

> 3) The Mandate required the Court to afford "Chrispus, Juranitch, Tarrant, and Pugatch . . . an appropriate hearing." *In re Glob. Energies, LLC*, 763 F.3d at 1350.

As directed by the Mandate, the Court "conduct[ed] any hearings necessary in the exercise of all its powers at law or in equity" and gave "Chrispus, Juranitch, Tarrant, and Pugatch . . . an appropriate hearing." *In re Glob. Energies, LLC*, 763 F.3d at 1350. Rather than merely holding a non-evidentiary hearing, the Court found that an evidentiary hearing, at least, was necessary because the "facts [were] bitterly contested, . . . credibility determinations must be made," and the adversary proceeding brought all of the parties under the Court's jurisdiction. *Grigsby*, 635 F. App'x at 735 (quoting *McDonald's Corp.*, 147 F.3d at 1312-13) (finding that the trial court could hold an evidentiary hearing, even if the mandate did not require such a hearing); *see* discussion *supra* Section I.S. Importantly, the parties elected to pursue an adversary proceeding, which culminated in an eleven-day trial. *See* discussion *supra* Section I.S. The Court in its discretion heard both the Second Motion to Dismiss [D.E. 128, Main] and the Amended Complaint [D.E. 232-1, Adv. Proc.] simultaneously because the factual issues were intertwined. *See supra* note 2. The Court gave Mr. Wortley a significant amount of leeway during the trial because he was proceeding *pro se*. *See supra* note 52 and accompanying text.

As discussed above, this Court "enter[ed orders] in strict compliance with the mandate" as required by Eleventh Circuit precedent. *Piambino*, 757 F.2d at 1119 (citing *In re Sanford Fork & Tool Co.*, 160 U.S. at 255). However, after the conclusion of the eleven-day trial and consideration of the evidence, the Court found that this case presents the rare occasion where the mandate rule should not apply, at least in part. First, Eleventh Circuit precedent acknowledges that the Court "is free to address, as a matter of first impression, those issues not disposed of on appeal." *Id.* (internal citations omitted). The Mandate did not

require – impliedly or expressly – the Court to grant the Second Motion to Dismiss [D.E. 128, Main] and dismiss the bankruptcy case. The Mandate only required the Court to grant the Rule 60(b)(2) motion, which requested a *rehearing* of the Second Motion to Dismiss.[62] This Court, as directed, has granted the Rule 60(b)(2) motion. [D.E. 1046, Main].

Even if the Eleventh Circuit impliedly required dismissal, the mandate rule cannot apply because the eleven-day trial uncovered "new" and "substantially different" evidence. *Piambino*, 757 F.2d at 1120 (citing *Zant*, 743 F.2d at 768-69; *Baumer*, 685 F.2d at 1320); *Grigsby & Assocs.*, 635 F. App'x at 735 (quoting *McDonald's Corp.*, 147 F.3d at 1312-13). First, at the original one-day evidentiary hearing on the Second Motion to Dismiss [D.E. 128, Main], the Court heard only Mr. Wortley's case-in-chief including the testimony of two witnesses, Mr. Wortley and Mr. Juranitch. *See* discussion *supra* Section I.P. After considering Mr. Wortley's case-in-chief, the Court entered a directed verdict, which meant that Chrispus never had the opportunity to present its case, enter evidence, or produce witnesses. *See* discussion *supra* Section I.P. Contra, at the eleven-day trial, the Court heard testimony from fourteen witnesses – Mr. Wortley, Mr. Juranitch, Mr. Tarrant, Mr. Raymond Kramer, Mr. Steven Davis, Mr. Michael McCarty,  Mr. Ryan O'Connor, Mr. Barry Mukamal, Mr. Richard A. Pollack, Mr. Chad Pugatch, Mr. Steven Lippman, Mr. Charles Throckmorton, Mr. George Zinkler, and Ms. Patricia Metlika. "[T]he testimony of a number of witnesses who had not testified at the first trial" constitutes "new and substantially different evidence." *Ash*, 664 F.3d at 892. Here, the Court heard the testimony of twelve witnesses, who had not previously testified at the first trial, including a key party – Mr. Tarrant, who was a principal of the petitioning creditor, Chrispus. This fact alone justifies a deviation from the mandate rule, under *Ash*. *Id.*

Second, the Court found the *Robinson* case particularly instructive. In *Robinson*, "the prior panel relied upon what . . . turned out to be, after the proceedings on remand, an erroneous view of the facts." *Robinson*, 690 F.2d at 872. The magistrate judge's original findings were too vague and permitted the appellate court

---

[62] Mr. Wortley filed a writ of mandamus with the Eleventh Circuit requesting immediate dismissal and damages, and the Eleventh Circuit denied Mr. Wortley's writ of mandamus – without requiring responses from either defendants or this Court – rather than ordering this Court to immediately dismiss the case or administer other relief.

to make an assumption of the case that was ultimately incorrect. *Id.* at 873. "After conducting a new evidentiary hearing on remand, as mandated by the prior panel, the magistrate entered more detailed findings of fact," and the second panel "decline[d] to adhere to the prior panel's ruling." *Id.* Here, the Court's original findings of fact were a mere paragraph, and it was possible for the prior panel to make assumptions that produced an "erroneous view of the facts." *Id.* at 872; *see* discussion *supra* Section I.P. The Mandate required an "appropriate hearing," and after conducting the eleven-day trial and hearing both sides of the case, the Court's instant findings of fact are more detailed than the original findings and focus on the credibility of the parties and the details surrounding the filing of the bankruptcy. *Id.* at 873. For these reasons, the Court found that the unique circumstances of this case justify a deviation from the mandate rule.

## A. The Court Found No Evidence of a Bad Faith Filing to Support Dismissal of the Bankruptcy.

Under 11 U.S.C. § 1112(b)(1), "on request of a party in interest, . . . the court shall . . . dismiss a case . . . for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."[63] Although § 1112(b)(4) of the Bankruptcy Code recites a laundry list of potential types of "cause,"[64] the Eleventh Circuit precedent found that "there

---

[63] Although the main bankruptcy case, In re Global Energies, LLC, has since been converted to a Chapter 7 proceeding [D.E. 616, 10-28935], the main bankruptcy case was originally filed as an involuntary Chapter 11 proceeding [D.E. 1, 10-28935] and was a Chapter 11 proceeding at the time Mr. Wortley lodged his Second Motion to Dismiss [D.E. 128, Main]. Thus, the Court employed a Chapter 11 dismissal analysis.

[64] [T]he term "cause" includes (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to one or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any); (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28; (L) revocation of an order of confirmation under section 1144; (M) inability to effectuate substantial consummation of a confirmed plan; (N) material default by the debtor with respect to a confirmed plan; (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

is no particular test for determining whether a debtor has filed a petition in bad faith."[65] *In re Phx. Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988); *Gen. Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501 (11th Cir. 1997). A court's "determination of cause under § 1112(b) is 'subject to judicial discretion under the circumstances of each case,'" and "[t]he equitable nature of this determination supports the construction that a debtor's lack of 'good faith' *may* constitute cause for dismissal." *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984) (emphasis added); *In re Balboa St. Beach Club, Inc.*, 319 B.R. 736, 740 (Bankr. S.D. Fla. 2005) (finding that the courts decide motions to dismiss for bad faith "on a case by case basis"). The Eleventh Circuit found that "the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particular, factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'" *Piccadilly*, 849 F.2d at 1394 (quoting *In re Albany Partners, Ltd.*, 749 F.2d at 674)[66].

The Eleventh Circuit provided the following "non-exhaustive" factors, which are "not to be rigidly applied," as guidance for lower courts:

> (i) The Debtor has only one asset, the Property, in which it does not hold legal title;
> (ii) The Debtor has few unsecured creditors whose claims are small in relation to the claims of the Secured Creditors;
> (iii) The Debtor has few employees;
> (iv) The Property is the subject of a foreclosure action as a result of arrearages on the debt;
> (v) The Debtor's financial problems involve essentially a dispute between the Debtor and the Secured Creditors which can be resolved in the pending State Court Action; and
> (vi) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights.

*Id.* at 1394-95; *State St. Houses, Inc. v. N.Y. State Urban Dev. Corp. (In re State St. Houses, Inc.)*, 356 F.3d 1345, 1346-47 (11th Cir. 2004). A finding that "there is no realistic possibility of an effective

---

[65] Mr. Wortley argued that the "Badges of Fraud" applied to the instant case; however, the Court found the "Badges of Fraud" inapplicable because the case requires a determination of whether a bad faith filing occurred, and it does not include a fraudulent transfer. *See Gen. Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485 (11th Cir. 1997).

[66] The Eleventh Circuit held that "the guidelines set forth by this Court in *In Re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988) and *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir.1984) have not been modified by the Bankruptcy Reform Act of 1994." *State St. Houses, Inc. v. N.Y. State Urban Dev. Corp. (In re State St. Houses, Inc.)*, 356 F.3d 1345, 1347 (11th Cir. 2004).

reorganization" would support the conclusion that the debtor "seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Albany Partners, Ltd.*, 749 F.2d at 674.

The Eleventh Circuit has also provided three other recognized tests for bad faith: "the improper purpose test, the improper use test, and the test modeled on Rule 9011 of the Federal Rules of Bankruptcy Procedure." *In re Glob. Energies, LLC*, 763 F.3d at 1349-50 (citing *Gen. Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997)). "Under the improper purpose test, 'bad faith exists where the filing of the petition was motivated by ill will, malice or the purpose of embarrassing or harassing the debtor.'" *Id.* at 1349 n. 5 (quoting *Gen. Trading*, 119 F.3d at 1501-02). "Under the improper use test, bad faith exists when a creditor uses a bankruptcy proceeding to accomplish objectives not intended by the Bankruptcy Code, such as taking over a debtor corporation and its assets." *Id.* "[U]nder the test modeled on Rule 9011 of the Federal Rules of Bankruptcy Procedure, bad faith exists, where a filing party (1) fails to make a reasonable inquiry into the facts and the law before filing and (2) files the petition for an improper purpose." *Id.* As this Court found in prior precedent, all tests for bad faith seek to determine whether there is a "presence of an honest intention and a real need and ability on the part of the debtor to effectuate the aim of reorganization, even if this involves a total liquidation of the debtor's assets." *In re Balboa St. Beach Club, Inc.*, 319 B.R. at 743.

Here, the Court has failed to find any evidence that Chrispus filed the involuntary Chapter 11 bankruptcy petition in bad faith under the Eleventh Circuit's tests – the *Piccadilly* factors, the improper purpose test, the improper use test, and the test modeled on Rule 9011. The Court has found that Chrispus' primary purpose in filing the involuntary petition was to reorganize Global Energies and resolve the deadlock between the primary members. *See* discussion *supra* Sections I.H, I.K. The Court based this finding of fact on the facts as a whole, especially the following specific facts. Chrispus filed the involuntary petition under Chapter 11 of the Bankruptcy Code (rather than Chapter 7); Mr. Tarrant testified that he wanted to reorganize Global Energies, keep Mr. Wortley involved, and make Mr. Wortley whole; Mr. Tarrant and Mr. Roberts attempted to resolve the deadlock between the parties before and after the bankruptcy filing; the "smoking gun" emails revealed an intent to reorganize; and the Trustee testified there

was "potential" to reorganize but a sale of the assets was the best outcome. *See* discussion *supra* Sections I.G, I.H, I.K, I.M.

**1. The *Piccadilly* Factors**

Under the *Piccadilly* factors,[67] the Court acknowledged that some of the factors indicating bad faith have been satisfied. Namely, Global Energies did not own any patents and had very few tangible assets; Global Energies had few employees; Global Energies had few unsecured creditors with claims that were smaller than the secured creditors; and the primary financial problem was a dispute between Global Energies and Chrispus, a secured creditor. However, the Court emphasized that the *Piccadilly* factors are "non-exhaustive" and "not to be rigidly applied." *Piccadilly*, 849 F.2d at 1394 (quoting *In re Albany Partners, Ltd.*, 749 F.2d at 674). The thrust of the *Piccadilly* test is to find evidence of "'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particular, . . . evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'" *Id.*

Although a few of the *Piccadilly* factors may have been satisfied, the Court failed to find any evidence of an "intent to abuse the judicial process" or "delay or frustrate the legitimate efforts of the secured creditors to enforce their rights." *Id.* The Court found that Chrispus, a secured creditor, filed the involuntary petition for the purpose of reorganizing Global Energies and resolving the deadlock for the benefit of the creditors and parties involved. *See* discussion *supra* Section I.K. In fact, Chrispus and Mr. Tarrant seem to have acted altruistically to ensure employees of Global Energies were paid in full and subordinated Chrispus' own claim to ensure the claims of all other creditors, including Mr. Wortley, were paid in full. *See* discussion *supra* Sections I.I, I.M. Chrispus filed a Chapter 11 involuntary petition, which was uncontested by Mr. Wortley, and filed a motion for the appointment of a trustee, who made the decision to liquidate Global Energies' assets after attempting to reorganize the company. *See* discussion *supra* Sections I.L, I.M. These actions showed that Chrispus operated with the intent to utilize the judicial process

---

[67] The *Piccadilly* factors may not apply in the instant case because the *Piccadilly* case can be easily distinguished based on the facts; however, the Court has included an analysis utilizing this test out of an abundance of caution.

for the benefit of the creditors, not to abuse the process or delay or frustrate their rights. The Court found Mr. Wortley's testimony to the contrary lacked the credibility necessary to rebut these facts. *See* discussion *supra* Section I.U.1; *Anderson v. Bessemer*, 470 U.S. at 574.

**2. The Improper Purpose Test**

"Under the improper purpose test, 'bad faith exists where the filing of the petition was motivated by ill will, malice or the purpose of embarrassing or harassing the debtor.'" *In re Glob. Energies, LLC*, 763 F.3d at 1349 n. 5 (quoting *Gen. Trading*, 119 F.3d at 1501). As the majority owner of Chrispus, Mr. Tarrant testified credibly that the purpose of the filing was to reorganize and resolve the deadlock. *See* discussion *supra* Sections I.K, I.U.2. This testimony indicates that Chrispus was not "motivated by ill will, malice or the purpose of embarrassing or harassing" Global Energies because Chrispus' intent was to reorganize or resurrect Global Energies after the breakup between Mr. Wortley and Mr. Juranitch. *See* discussion *supra* Section I.K.; *In re Glob. Energies, LLC*, 763 F.3d at 1349 n. 5 (quoting *Gen. Trading*, 119 F.3d at 1501).

The improper purpose test is designed to prevent a filing designed to harm the debtor, not an owner or manager of the debtor; however, to the extent that Mr. Wortley is a managing member of Global Energies, this Court still would not find that Chrispus filed with an improper purpose to embarrass or harass Mr. Wortley. When asked directly by Mr. Wortley if Mr. Tarrant had a "plan to get rid of me [Mr. Wortley]," Mr. Tarrant responded: "No, not at all. Not at all. . . . You're my friend, you got me into this." Trial Tr. Vol. X, 2225. Mr. Tarrant's credible testimony demonstrates that Chrispus did not file the bankruptcy for an improper purpose towards Mr. Wortley. *See supra* Section I.U.2. Mr. Wortley's testimony to the contrary lacked the credibility necessary to rebut these facts, and Mr. Wortley's own testimony revealed his personal animus towards Mr. Tarrant and his own intention to harass Mr. Tarrant by disparaging Mr. Tarrant's reputation in his hometown where his family resides. *See* discussion *supra* Section I.U.1; *Anderson v. Bessemer*, 470 U.S. at 574.

**3. The Improper Use Test**

"Under the improper use test, bad faith exists when a creditor uses a bankruptcy proceeding to accomplish objectives not intended by the Bankruptcy Code, such as taking over a debtor corporation and

its assets." *In re Glob. Energies, LLC*, 763 F.3d at 1349 n. 5 (quoting *Gen. Trading*, 119 F.3d at 1501). In this bankruptcy, Chrispus moved immediately for the appointment of a Chapter 11 trustee and did not seek to have Chrispus named as the trustee. *See* discussion *supra* Section I.L. Further, when the Trustee solicited offers to purchase the assets of Global Energies, all parties to the case had the opportunity to make an offer, and Chrispus made a final offer to Mr. Wortley to take the deal that Chrispus had negotiated with the Trustee, which Mr. Wortley refused. *See* discussion *supra* Section I.M. Chrispus and Mr. Tarrant had no need to attempt a takeover of Global Energies because Global Energies had a value of zero at the time of filing the bankruptcy, and they had already started a separate company, Plasma Power. *See* discussion *supra* Sections I.H, I.I. Ultimately, Chrispus and Mr. Tarrant never profited from any of these businesses or the bankruptcy filing, and only Mr. Wortley benefitted. *See* discussion *supra* Sections I.H., I.I., I.T. Based on this evidence, the Court cannot find bad faith under the improper use test because Chrispus did not use the bankruptcy to attempt a takeover of Global Energies and its assets. Further, Mr. Wortley's testimony to the contrary lacked credibility. *See* discussion *supra* Section I.U.1; *Anderson v. Bessemer*, 470 U.S. at 574.

### 4. The Test Modeled on Rule 9011 of the Federal Rules of Bankruptcy Procedure

"[U]nder the test modeled on Rule 9011 of the Federal Rules of Bankruptcy Procedure, bad faith exists, where a filing party (1) fails to make a reasonable inquiry into the facts and the law before filing and (2) files the petition for an improper purpose." *In re Glob. Energies, LLC*, 763 F.3d at 1349 n. 5 (quoting *Gen. Trading*, 119 F.3d at 1502). First, Mr. Tarrant, as a majority owner of Chrispus, conducted a thorough examination of Global Energies' books and records with the assistance of Mr. Roberts and a forensic accountant. *See* discussion *supra* Section I.F. Additionally, Mr. Tarrant and Mr. Roberts consulted the advice of counsel prior to filing the bankruptcy. *See* discussion *supra* Sections I.G, I.H. The Court found this investigation and the use of an attorney to be more than reasonable inquiry into the facts and law before filing the bankruptcy. Second, Chrispus did not file for an improper purpose, as the Court has found. *See* discussion *supra* Sections I.G., I.H, II.A.2. Under this two-prong test, the Court cannot find that Chrispus filed the involuntary petition in bad faith. Any testimony from Mr. Wortley to the contrary lacked the

necessary credibility to rebut these facts. *See* discussion *supra* Section I.U.1; *Anderson v. Bessemer*, 470 U.S. at 574.

**5. Conclusion**

The Court must decide whether a filing was done in bad faith on a case-by-case basis. In this case, the facts, taken as a whole, support a finding of the "presence of an honest intention and a real need and ability on the part of the debtor to effectuate the aim of reorganization, even if this involves a total liquidation of the debtor's assets." *In re Balboa St. Beach Club, Inc.*, 319 B.R. at 743. Global Energies was deadlocked due to the actions of its managing-members (especially Mr. Wortley), and the Operating Agreement provided no relief for breaking the deadlock. *See* discussion *supra* Sections I.B, I.D, I.G. After three offers to Mr. Wortley to resolve the deadlock, Chrispus, a member of Global Energies with no management authority, made a decision to file bankruptcy in the hopes of reorganizing Global Energies and resolving the deadlock. *See* discussion *supra* Sections I.G., I.K. This Court found that Chrispus filed with an "honest intention," and Global Energies had a "real need and ability" to reorganize, even if the ultimate result was "total liquidation." *In re Balboa St. Beach Club, Inc.*, 319 B.R. at 743. The Court holds that Chrispus did not file the involuntary petition in bad faith because Chrispus filed for the purpose of reorganizing Global Energies due to deadlock between the managing members. The Court limits this holding to the instant set of facts as outlined in excruciating detail in Part I of this order. To the extent that Mr. Wortley's testimony contradicts this Court's findings and holdings, the Court found Mr. Wortley's testimony to lack credibility. *See* discussion *supra* Section I.U.1; *Anderson v. Bessemer*, 470 U.S. at 574.

**B. The Court Found No Evidence of Bad Faith in Either the Filing of the Bankruptcy or Discovery Practice to Support Mr. Wortley's Requested Sanctions Against the Defendants.**

The remaining counts of the Amended Complaint [D.E. 232-1] requested varying levels of sanctions against the Defendants based on the Mandate and expected findings of bad faith conduct. *See* discussion *supra* Section I.S.  Count V requested equitable disallowance of the Chrispus Claim. [D.E. 232-1 at 33-35]. Count VI requested an accounting and disgorgement of Mr. Chad Pugatch and his Law Firm's legal fees. *Id.* Count VII requested reimbursement of Plaintiff's excess costs, expenses, and attorney's fees

against Mr. Pugatch and Law Firm, pursuant to 28 U.S.C. § 1927. *Id.* Finally, Count VIII requested the Court to enforce the Mandate against Mr. Tarrant, Chrispus, Mr. Juranitch, and Mr. Pugatch by "award[ing Mr.] Wortley all of his damages, attorneys' fees, costs, and interests, to be paid by Defendants, jointly and severally." *Id.*

For Counts V and VIII, Mr. Wortley argued that the Mandate required this Court to enter sanctions against all Defendants because the Eleventh Circuit allegedly found that Chrispus filed the Involuntary Petition in bad faith. [D.E. 232-1 at 33-35]. As explained above, this Court analyzed the Second Motion to Dismiss [D.E. 128, Main] as an issue of first impression, and, in the event that it is not an issue of first impression, the Court determined that the "new" and "substantially different" evidence heard at the eleven-day trial cannot and does not support a finding of bad faith. *See supra* Part II, Section II.A. Thus, without a finding of bad faith to unlock the Court's inherent power to sanction, the Court cannot sanction the Defendants. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (citing *Sciarretta v. Lincoln Nat'l Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015)). Further, even if the Court found bad faith, Mr. Wortley failed to provide evidence of his damages, and the evidence at trial proved that Mr. Wortley was the only party to benefit from the bankruptcy filing. *See* discussion *supra* Section I.T.

For Counts VI and VII, Mr. Wortley sought sanctions specifically against Mr. Pugatch and the Law Firm based on the Eleventh Circuit's Mandate to this Court to "ensure that . . . [Mr.] Pugatch do[es] not profit from [his] misconduct and abuse of the bankruptcy process." *In re Glob. Energies, LLC*, 763 F.3d at 1350. The Eleventh Circuit made a finding that Mr. Pugatch "actively obstructed Wortley's efforts to obtain evidence of the plan to file for involuntary bankruptcy" and withheld the "smoking gun" emails from Mr. Wortley. *Id.* at 1346, 1348-49. The Eleventh Circuit refrained from entering sanctions against Mr. Pugatch and his Law Firm because Mr. "Pugatch ha[d] not had an appropriate hearing, which will be conducted before the bankruptcy court." *Id.* at 1350. As mandated by the Eleventh Circuit, this Court conducted an appropriate hearing, i.e. the eleven-day trial, on the issues. *See* source cited *supra* note 59. Although the Eleventh Circuit seemed to squarely decide the issue of discovery misconduct, this Court determined that the mandate rule cannot apply to the discovery misconduct issue. *See supra* Part II. The eleven-day trial

67

was the first trial on the discovery misconduct issue, the first time Mr. Pugatch and the Law Firm were

parties to the litigation, and the first time Mr. Pugatch and his associates were able to testify before the

Court. The Court found Mr. Pugatch to be a credible witness, [68] and the testimony and evidence revealed at

this trial was new and substantially different from the facts before the Eleventh Circuit on appeal. *See supra*

Part II; *Ash*, 664 F.3d at 891 (citing *Friedman*, 520 F.3d at 1295); *Robinson*, 690 F.2d at 873.

"Courts have the inherent power to police those appearing before them."[69] *Purchasing Power, LLC*,

851 F.3d at 1223 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S. Ct. 2123, 2133 (1991);

*Sciarretta*, 778 F.3d at 1212). This inherent power permits a court to sanction a party or attorney who has

committed misconduct; however, the inherent power may only be "unlocked" by a "finding of bad faith."

*Id.* (citing *Sciarretta*, 778 F.3d at 1212). The Eleventh Circuit held that "recklessness alone does not satisfy

the inherent powers standard; there must be more." *Id.* at 1225. If a court found bad faith misconduct that

rose above the level of recklessness, then "the court can shift only those attorney's fees incurred because

of the misconduct at issue." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017).

Here, the Court considered Mr. Wortley's allegations that Mr. Chad Pugatch and the Law Firm

engaged in discovery misconduct and purposefully withheld the "smoking gun" emails from him. The Court

found that the evidence revealed that – because the Court entered a protective order forcing the discovery

to be produced in state court – the discovery dispute occurred in the state court, not the bankruptcy court.

*See* discussion *supra* Section I.Q. Mr. Pugatch and the Law Firm were not "appearing before" this Court

when the alleged discovery misconduct occurred; thus, this Court cannot have jurisdiction to sanction Mr.

Pugatch and the Law Firm when the conduct occurred in a different court. *See Purchasing Power, LLC*,

851 F.3d at 1223 (citing *Chambers*, 501 U.S. at 46).

---

[68] Mr. Pugatch credibly testified that he did not profit from the bankruptcy because the only compensation Mr. Pugatch and his Law Firm received was compensation for legal work billed to his client, Chrispus, and the billing ended after the Eleventh Circuit issued the Mandate. Trial Tr. Vol. VIII, 1817; *see supra* Section I.U.4.
[69] The inherent power is the only valid basis for consideration of sanctions in this case because Mr. Wortley's Section 303 claim was dismissed, invalidating the associated fee-shifting statute, and Mr. Wortley failed to raise any other fee-shifting statute that may apply. *See* discussion *supra* Section I. The Mandate is an invalid basis for awarding fees because the Court has determined that the mandate rule cannot apply to the issue of discovery misconduct. S

To the extent that this Court does have jurisdiction over the allegations, the Court found that the delay in producing the "smoking gun" emails was justifiable or excusable, and the alleged misconduct only rose to the level of recklessness, at the most. *See* discussion *supra* Section I.Q. First, Mr. Zinkler, Mr. Lippman, and Mr. Pugatch explained that they withheld the "smoking gun" emails in the beginning because they believed the "smoking gun" emails were privileged. *See supra* p. 45. Indeed, the "smoking gun" emails were listed on the first privilege log in the state court case. *See supra* p. 45. Second, after Mr. Pugatch and his Law Firm determined that they were not going to raise a claim of privilege for the "smoking gun" emails, the Court found that "smoking gun" emails were produced, according to the agreed procedure, in June 2011. *See supra* p. 45-46. Mr. Wortley's counsel – Mr. Kramer and Mr. Graner – failed to retrieve the "smoking gun" emails until March 2012. *See supra* p. 45-46.

The Court excused the delay in retrieval of the "smoking gun" emails because Mr. Wortley substituted counsel during this time, which caused delay and confusion, and there was a miscommunication between Mr. Kramer's law firm and Mr. Pugatch's law firm. *See supra* p. 47. Although the procedure of waiting for opposing counsel to retrieve the discovery may not be the best practice, the Court found that Mr. Pugatch and his Law Firm did not commit any discovery misconduct in bad faith. Additionally, the Court found no evidence of bad faith conduct by Mr. Pugatch and his Law Firm during the course of the bankruptcy, including the filing of the bankruptcy case. Thus, because the evidence could not support a finding of bad faith, the inherent power cannot be unlocked, and the Court cannot find in favor of Mr. Wortley and sanction Mr. Pugatch or the Law Firm. *Purchasing Power, LLC*, 851 F.3d at 1223 (citing *Sciarretta*, 778 F.3d at 1212).

Accordingly, it is

**ORDERED** as follows:

1. In the main case, the Second Motion to Dismiss [D.E. 128, Main] is **DENIED** with prejudice, and the bankruptcy will remain instated. The Trustee is **DIRECTED** to take any remaining action necessary to administer and close the bankruptcy case.

2. In the adversary proceeding, the Court finds in favor of the Defendants as to all remaining counts. The Court will not award damages or attorney's fees to either Mr. Wortley or the Defendants. All pending motions in the adversary proceeding are **DENIED** as **MOOT**. The Clerk is **DIRECTED** to **CLOSE** the adversary proceeding.

# # #

*The Clerk shall provide copies of this Order to:*

Attorney Michael Goldberg

[Attorney Goldberg is hereby directed to serve a conformed copy of this order on all interested parties and file a Certificate of Service.]